# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 30, 2010 Session

## TENNESSEE AMERICAN WATER COMPANY, v. THE TENNESSEE REGULATORY AUTHORITY, et al.

**Appeal from the Tennessee Regulatory Authority**
**No. 08-00039**

---

**No. M2009-00553-COA-R12-CV - Filed January 28, 2011**

---

The Tennessee American Water Company petitioned the Tennessee Regulatory Authority to approve a revision to the existing rates it charges its customers for water. The Authority authorized a revision in the existing tariffs but made several rulings adverse to the plaintiff. Plaintiff has appealed numerous issues. On appeal, we affirm the rulings of the Authority, except its ruling which only allowed plaintiff to recover one-half of the rate case expenses. We hold that ruling was arbitrary and we require the Authority to pay the full amount of the rate case expenses claim.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Tennessee Regulatory Authority Affirmed in Part and Reversed in Part.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and. D. MICHAEL SWINEY, J., joined.

R. Dale Grimes, Nashville, Tennessee, for the Appellant, Tennessee American Water Company.

J. Richard Collier, Kelly Cashman-Grams and Shilina B. Brown, Nashville, Tennessee, for the Appellee, Tennessee Regulatory Authority.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Ryan McGehee, Assistant Attorney General, Nashville, Tennessee, for the Appellee, Consumer Advocate and Protection Division of the Office of the Tennessee Attorney General.

Frederick L. Hitchcock, Harold L. North, Jr., Tom Greenholtz, Michael A. McMahan and Valerie L. Malueg, Chattanooga, Tennessee, for the Appellee, City of Chattanooga.

David C. Higney, Chattanooga, Tennessee, and Henry M. Walker, Nashville, Tennessee, for the Appellee, Chattanooga Manufacturers Association.

# OPINION

## Background

Appellant, Tennessee American Water Company (TAWC), is an investor-owned public utility that provides water service to residential, industrial, commercial and municipal customers in the City of Chattanooga, Tennessee and area. It is a wholly owned subsidiary of American Water Works Company, Inc. (Parent Company). Parent Company is a holding company that owns numerous operating subsidiaries providing water services in locations across the United States.

TAWC, is required to obtain approval from the Tennessee Regulatory Authority (TRA or Authority), before implementing an increase in the rates it charges its customers. Tenn. Code Ann. § 65-5-103(a). TAWC's rates must be set forth in tariffs filed with and approved by TRA and TAWC can only charge the rates set forth in a duly filed and effective tariff. Tenn. Code Ann. § 65-5-102; Tenn. Comp. R. & Regs. 1220-4-1-.03. If TAWC wants to implement a rate increase due to increased expenses or investments or decreased revenues or for any other reason, it is required to file a revision to the existing tariffs and a petition asking TRA to approve the revision to the existing rates. Tenn. Code Ann. § 65-5-103; Tenn. Comp. R. & Reg. 1220-4-1-.03 to .06.

On March 14, 2008, TAWC filed its petition (2008 Rate Case) with the TRA in which it sought approval of "customer rates that will produce an overall rate of return of 8.514% on a rate base of $119,881,506". Along with the petition, TAWC filed the pre-filed testimony of nine witnesses, a Management Report and documentary evidence in support of the requested rate increase. This petition was TAWC's fourth such filing within a five year period.

On April 7, 2008, the TRA panel initially assigned to the 2008 Rate Case voted to suspend the proposed tariff from April 13, 2008 to July 11, 2008 and to convene a contested case proceeding and appoint a Hearing Officer for the purpose of preparing the matter for hearing before the panel.

On April 1, 2008, the Consumer Advocate and Protection Division of the Office of the Attorney General (Consumer Advocate or CAPD) filed a petition to intervene. The Chattanooga Manufactures Association (CMA) filed a petition to intervene, and the City of Chattanooga (the City) likewise filed a petition to intervene. There was no opposition to the petitions to intervene and the TRA permitted the interventions.

Between May 12, 2008 and mid-August 2008 extensive discovery was conducted by the parties and multiple motions were filed regarding discovery disputes. The hearing on the 2008 Rate Case commenced in Chattanooga on August 18, 2008 and continued there until August 22, 2008. The hearing was then reconvened in Nashville on August 26, 2008 and

concluded on August 27, 2008.

The TRA panel held public deliberations on September 22, 2008. The TRA made numerous determinations of TAWC's revenues, expenses, rate base and rate of return for the attrition year and concluded that TAWC had a revenue deficiency of $1,655,541. Accordingly, the TRA granted a rate increase to increase the revenue by $1,655,541. The TRA also ordered a "Request for Proposal" for an extensive management audit by an independent certified accountant of the management fees incurred by the TAWC from American Water Works Service Company (Service Company). The Request for Proposal was to be filed with the TRA no later than September 28, 2008.

On January 13, 2009, TRA entered the final order in the 2008 rate case, and TAWC filed a petition for direct review of numerous aspects of the TRA's decision pursuant to Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii) with the Middle Section of this Court. The Appellant, separately filed a motion to transfer the appeal of this case to the Eastern Section of the Court, which was granted.

## Summary of Evidence Before the Authority

In ruling on TAWC's petition in the 2008 Rate Case, the TRA was required to make determinations on a number of complex components that must be considered when fixing just and reasonable rates and the Final Order of January 13, 2009 reflects those determinations. TAWC has sought review of the following contested issues that were a part of the multiple factors considered by the TRA: The selection of the test period; revenues, specifically Weather Adjustment Normalization; management fees, including the cost of the Management Audit performed by TAWC; fuel and power expenses, specifically the establishment of an unaccounted-for water loss percentage; and regulatory expense.

TAWC contends that TRA erred in applying more than one test year to TAWC's expenses, revenues and rate base. A "test period" or "test year" is a measure of a utility's financial operations and investments over a specific twelve month period. A test year is used to build an "attrition year", which is the forecast used to set rates. In this rate case TAWC urged TRA to use an historical test year ending on November 30, 2007 and the Consumer Advocate used a test year ending March 31, 2008. Both TAWC and the Consumer Advocate utilized an attrition year ending August 31, 2009. The issue of utilizing only TAWC's proposed test year was contested. In its final decision, the TRA utilized portions of both test years for different determinations. The agency utilized the test period which it found to best fit the individual item being forecasted. Although TAWC contends that it was the policy of TRA in past rate cases to apply only one test period to all issues, the Consumer Advocate correctly pointed to the evidence that TRA had utilized multiple test year periods in the 2006 rate case.

TAWC described management fees as follows:

Management fees are the charges from American Water Works Service Company ("AWWSC") for services provided under the 1989 Service Company contract. Those

services consist of services related to accounting, administration, communication, corporate secretarial, engineering, finance, human resources, information systems, operations, rates and revenue, risk management, water quality and other services as agreed by the Company. These services are billed at cost to TAWC.

In the 2008 Rate Case, TAWC sought in its initial filing $4,335,190 for management fees.

In order to address this issue on appeal, a review of a portion of the Final Order in the 2006 Rate Case is required. As part of the 2006 Rate Case, TAWC initially requested management fees in the amount of $4,064,421. The Consumer Advocate requested that management fees be set in the amount of $3,021,111. The City and the CMA argued that the TRA should not approve any management fees as TAWC had not met its burden of proof on the issue. The TRA concluded that management fees for the attrition period should be $3,979,825. The TRA also ordered that TAWC have a management audit performed. The Final Order from the 2006 Rate Case specified the requirement of a management audit as follows:

> TAWC should have a management audit performed in compliance with Sarbanes-Oxley requirements and submit the results to the Authority in one year or, if the audit is not complete in one year, submit a status report on the audit in one year. This audit should determine whether all costs allocated to TAWC were incurred as a result of prudent or imprudent management decisions by TAWC's parent and should address the reasonableness of the methodology used to allocate costs to TAWC.

TRA had directed TAWC to submit the results of a management audit or a status report on the management audit within one year of deliberations in the 2006 Rate Case, which occurred on May 15, 2007. However, less than a year later, on March 14, 2008, TAWC filed its Petition in this case, the 2008 Rate Case, and with the Petition, it submitted a report prepared by the management consulting firm Booz Allen Hamilton (Booz Allen). This report was entitled and referred to by a Booz Allen vice-president, Joseph Van den Berg, who sponsored the report as an "Independent Cost Assessment Report". Mr. Van den Berg testified that the report was prepared in compliance with the 2006 Rate Case Final Order's requirement that a management audit be submitted to the TRA.

TAWC supported its request for management fees with the Booz Allen Report and Mr. Van den Berg's testimony as well as with testimony from TAWC officers and employees. TAWC offered evidence regarding the amount of projected management fees in the attrition year and attributed the increase in fees since the 2006 Rate Case to factors such as labor and benefits costs. TAWC further presented evidence that because the Service Company's costs and benefits are shared by all American Water subsidiaries, TAWC is able to deliver more prompt and reliable service to its customers. There was evidence that the Service Company offers a wide range of services to TAWC, including a customer call center, accounting, operations, rates and revenues, administration, auditing, information systems, communications, human resources, risk management, finance, legal, water quality and engineering. The Company witnesses offered testimony that all of these services were necessary for TAWC to provide a high quality of service to its customers and that if the

Service Company was not employed, TAWC would have to obtain the same services elsewhere. TAWC provided evidence that if it shifted the services provided by the Service Company to the local level, the cost to TAWC would be higher because TAWC would have to hire full-time employees and outside contractors who would not bill at cost as the Service Company does.

The Company presented evidence to show that the Service Company was able to achieve cost savings based on its model that allows TAWC and other American Water subsidiaries to share in the cost of employing specialists, some of whom would not be needed in a full-time basis at a single utility. The Booz Allen consultant, Mr. Van den Berg, stated that in his opinion the service company model is a cost-effective way to operate utilities. Michael Miller, treasure/comptroller of the Company, attempted to explain the increase in management fees between 2004 and 2008. He stated that in 2004 and 2005 the Parent Company had instituted a company-wide reorganization that had shifted a number of full-time positions from TAWC to the Service Company. He claimed that this action resulted in a reduction in the growth of local labor costs that by 2008 had actually offset the increase in management fees by $1,239,713.

This evidence was presented in support of TAWC's initial request for management fees of $4,335,190. The Consumer Advocate arrived at a forecasted amount of $3,453, 233 for the attrition period. The other intervenors, the City and the CMA, did not provide an alternative amount for management fees to the TRA, but rather the City urged that no management fees, including the cost of the management audit, be allowed until TAWC obtained a proper audit which would be reviewed in a later proceeding.

After review of the testimony, a majority of the TRA panel concluded that the management fees for the attrition period should be set at $3,529,933. This amount was based on the Company's forecasted 2005 management fee amount with an annual customer growth/inflation factor.

The TRA panel's decision on the amount of management fees was split two to one. All of the panel members, however, agreed that the Booz Allen Report submitted by TAWC did not comply with the TRA's directive in the 2006 Rate Case Final Order and did not support approval of TAWC's request to recover management fees in the 2008 Rate Case.

The deliberations of the members of the panel on this issue offer insight as to why the panel did not accept TAWC's management fees for the attrition year and why the panel rejected the Booz Allen Report. Director Roberson, as part of a motion, stated that he had no doubt that the Service Company had incurred legitimate expenses, but he had a problem determining whether the amount of management fees requested by the Company to pay the Service Company was "a just and reasonable amount based on prudent expenditures." He went on to state that the audit the TRA had ordered TAWC to conduct and provide to the TRA in the 2006 Rate Case could have answered this important question "if it had been conducted properly." He noted that the evidence presented showed that in the five and a half years from 2004 to the forecasted attrition period in the 2008 Rate Case, management fees had increased by 73%. The Director also addressed the testimony of Michael Miller

regarding the company-wide reorganization that had shifted positions from TAWC in Chattanooga to the Service Company. He stated that there was less than $26,000 in efficiency gained by the reorganization since 2004 and that he had expected greater efficiency. He also stated that he looked forward to reviewing the conclusions of the comprehensive audit that was ordered in the 2006 Rate Case once it was properly prepared. He stressed that if the management audit shows that the management fees are prudent, the TRA will revisit the matter of management fees on its own motion or on motion of a party. He then explained his methodology for arriving at the management fees he approved.

Chairman Hargett voted in favor of Director Roberson's motion and added to the deliberations regarding the management audit ordered in the 2006 Rate Case. First the Chairman recapped the Final Order which required TAWC to submit a management audit to TRA: "The audit was to determine whether all costs allocated to [TAWC] were incurred as a result of prudent or imprudent management decisions by [the Service Company]." He then noted that the audit was to address the reasonableness of the methodology used to allocate costs to TAWC. Chairman Hargett expressed dissatisfaction with the Booz Allen Report as it did not meet those stated guidelines. He also expressed skepticism that Booz Allen was an independent company for purposes of conducting the audit as Mr. Van Den Berg, who oversaw the audit for Booz Allen, "frequently provides testimony for American Water Works Company in rate cases in other states." Finally the Chairman stated that he agreed with the methodology employed by the Director in arriving at the management fee figure of $3,529,933.

Director Freeman did not vote in favor of the management fees as proposed by Director Roberson and support by Chairman Hargett as he found that the Booz Allen Report submitted by TAWC did "not lend the evidence to support an increase in management fees from the last [2006] case." Based on this lack of evidence, Director Freeman stated that the management fees amount granted in the 2006 Rate Case should be adopted in the 2008 Rate Case.

> The Final Order in the 2008 Rate Case addressed the Booz Allen report as follows: Based on its evaluation, the City recommended disallowance of all costs related to the Booz Allen Report and all [the Service Company's] management fees and allocated cost until the Company obtains an audit that conforms to the specifications of the TRA and the new audit report is examined in a later proceeding. The City claimed, in part, that Booz Allen is not an independent public accounting firm; Booz Allen did not conduct an "audit" as required by the TRA or SOX [Sarbanes-Oxley regulations]; and Booz Allen did not conduct an audit in conformance with the rules of the Public Accounting Oversight Board. . . .

> The Final Order concluded:

> The record shows that from 2004 to the Company's forecasted attrition period in this docket, management fees have increased seventy-three percent during the five and one-half year time period. There was a fifty-nine percent increase between the 2004 fees and the fees approved in Docket No. 06-00290 [the 2006 Rate Case]. Therefore,

a majority of the panel voted to set the Management Fee attrition year expense amount at $3,529,933. This amount was based on the Company's forecasted 2005 Management Fee amount from Docket No. 04-00288 [2005] as used by the Consumer Advocate in this docket. The majority of the panel voted to change the growth factor to include all customer growth instead of one-half of customer growth, as used by the Consumer Advocate.

Because of unresolved questions regarding management fees assessed by the service company and requested by TAWC in Docket No. 06-00290 [the 2006 Rate Case], the TRA ordered TAWC to perform a management audit to determine whether all costs allocated to TAWC were incurred as a result of prudent or imprudent management decisions by TAWC's parent and to address the reasonableness of the methodology used to allocate cost to TAWC.

The Authority's June 10, 2008 Order in Docket no. 06-00290 stated at pages 26 - 27:

> TAWC should have a management audit performed in compliance with Sarbanes-Oxley requirements and submit the results to the Authority in one year or, if the audit is not complete in one year, submit a status report on the audit in one year. This audit should determine whether all costs allocated to TAWC were incurred as a result of prudent or imprudent management decisions by TAWC's parent and should address the reasonableness of the methodology used to allocate costs to TAWC.

A majority of the panel found that the management audit performed did not adequately address the issue of prudency of the management fees, and that the audit was not an independent audit as ordered in Docket No. 06-00290. The Booz Allen witness, Joe Van den Berg, who performed the management audit required by the TRA also provided testimony on behalf of TAWC in other dockets, both before the TRA and other utility commissions. For this reason, the panel determined that the independence of the selected audit firm was impaired. Further, the audit did not address the primary concerns of the Authority that the costs were the result of prudent management decisions.

Based on the foregoing findings regarding the Booz Allen Report, the TRA excluded amortization of the cost of the Booz Allen Report from the management fees. The Final Order also stated that because TAWC had not developed a Request For Proposal (REF) for a comprehensive management audit by an independent certified public accountant, as ordered in the 2006 Rate Case Final Order, TAWC had not complied with TRA's directive. The 2008 Rate Case Final Order provided specific criteria for a new audit:

> The REF for the audit shall include, but not limited to, an investigation of [the Service Company's] management performance and decisions relating to internal processes and internal controls with an attestation and recommendations of any needed management changes and implementation thereof. Further, the audit shall evaluate and attest to the charges allocated to TAWC, including efficiency of processes and/or

functions performed on behalf of TAWC, as well as the accuracy and reasonableness of the allocation factors utilized. This REF should be filed in this docket no later than six months from September 22, 2008.

On appeal, TAWC contends that the evidence presented to the TRA showed that the Booz Allen Report featured an in-depth analysis of the prudence of management decisions and cost allocation to TAWC by employment of management audit methodology and definition of prudence that has been used and accepted in multiple other jurisdictions. TAWC contends that Booz Allen examined and determined the prudence of TAWC's management decisions by examining seven aspects of the relationship between the Service Company and the Company and showed that the Service Company's costs per customer were less than most other utility companies that use a service company. Based on this finding, the report concluded that TAWC receives fair, reasonable and competitive charges from the Service Company.

Further, TAWC contends on appeal that the Booz Allen Report was in complete compliance with the applicable provisions of the Sarbanes-Oxley requirements as mandated by the 2006 Rate Case Final Order. Mr. Van den Berg stated in his pre-filed testimony that the Booz Allen report and his testimony were intended to address the part of the Final Order of the 2006 Rate Case that 'TAWC have a management audit performed in compliance with Sarbanes-Oxley requirements'". Mr. Van den Berg also testified at the hearing on the issue of compliance with Sarbanes-Oxley. He stated that it was his understanding that the only Sarbanes-Oxley requirement that pertains to a management audit, as opposed to a financial audit, was that the firm conducting the management audit be independent from the company that it audited. Mr. Van den Berg claimed that the audit Booz Allen conducted was an independent audit, but on cross-examination, admitted that he had done consulting work for TAWC on the previous rate case and that in the past several years he had done consulting work and testified in rate cases for subsidiaries of the Parent Company in Minnesota, Missouri and Indiana.

Appellees find multiple faults with the Booz Allen Report and Mr. Van den Berg's testimony. For instance, appellees argue that Mr. Van den Berg did not undertake any analysis of whether the level of administration services, audit services, communication services and legal services that were charged by the Service Company to TAWC were the right level or quantity. Appellees claim Mr. Van den Berg did not undertake any independent analysis to determine whether the Service Company was actually providing the services it was billing to TAWC. An example of this allegation provided by appellees is that Mr. Van den Berg testified that he believed the charges for accounting services billed to TAWC were appropriate merely because the category of accounting services was included in the service agreement between the Service Company and TAWC. There was no evidence that he had examined the actual accounting services provided.

Appellees also assert that Booz Allen further did not undertake to study or determine whether amounts paid by TAWC for services were for the correct quantity or volume of service. The allegation is based on Mr. Van den Berg's testimony that other than having discussions with TAWC management, Mr. Van den Berg did not consider whether the

services provided by the Service Company overlapped or duplicated activities conducted by TAWC employees nor did he consider the labor and benefits expense that TAWC was incurring locally. Appellees point to numerous other examples in the Booz Allen Report and in Mr. Van den Berg's testimony where there was no analysis of whether the services delivered to TAWC were necessary, reasonable and prudent. They also point out that the Booz Allen Report did not define prudence, imprudence or reasonableness.

The City offered the testimony of economic consultant Michael Majoros, Jr. as to why the Booz Allen Report was not a management audit, why it did not comply with Sarbanes-Oxley requirements and why it otherwise did not meet the requirements set forth in the Final Order of the 2006 Rate Case.

Mr. Majoros described the Sarbanes-Oxley Act of 2002:

Sarbanes-Oxley(SOX) is an Act co-authored by Senator's [sic] Sarbanes and Oxley and signed into law by President George W. Bush. It emanates from the ENRON and other corporate scandals in [the] early part of President Bush's first term. SOX requires detailed audits by independent certified public accountants. The purpose of the law is "[t]o protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws and for other purposes.

Mr. Majoros was then asked how an "audit" is defined by Sarbanes-Oxley. In response he quoted Section 2(a)(2) of the Act as defining an audit as: "An examination of the financial statements of any issuer by an independent public accounting firm in accordance with the rules of the Board or the Commission (or, for the period preceding the adoption of applicable rules of the Board under section 103, in accordance with then-applicable generally accepted auditing and related standards for such purposes), for the purpose of expressing an opinion on such statements". In Mr. Majoros' opinion, the Booz Allen Report was not an audit, as described by Sarbanes-Oxley, but an "assessment" and he noted that Mr. Van den Berg never referred to the report as an audit.[1] Mr. Majoros provided three principal reasons that the Booz Allen Report was not a management audit: (1) the report did not determine and apply definitions of prudence, imprudence, or reasonableness; (2) it did not determine whether the internal controls at the Service Company were designed to catch imprudent costs; and (3) its conclusions were subjective and were not based on objective audit tests or standards. He also explained that there were well-defined standards for preparation of a management audit of a utility as provided in the National Association of Regulatory Utility Commissioners publication, "Fundamental of Management Audits, Vol. I" and that Booz Allen had not utilized these standards.

Mr. Majoros further detailed twelve deficiencies in the Booz Allen Report, referenced as BAH, that caused it to be non-compliant with Sarbanes-Oxley (SOX) requirements:

---

[1] As noted above in footnote 2, Mr. Van den Berg testified that although he had referred to the report as a "cost assessment" he used the term "assessment" synonymously with audit. In fact, the Booz Allen report also refers to "report" and "audit" interchangeably in the first paragraph.

BAH is not an independent public accounting firm. [2]

BAH did not conduct an "audit" as specified by SOX.

BAH did not conduct an audit in conformity with or even cite to the rules of the Public Company Accounting Oversight Board.

BAH did not cite to professional standards and did not comply with stringent standards SOX requires.

BAH's report did not include a concurring or second partner review and approval of such report.

BAH's report did not contain any management attestations.

BAH's report is not independent, it was reviewed and edited by management.

BAH's report did not describe the scope of the auditor's testing of the internal control structure and procedures required by section 404(b) Internal Control Evaluation and Reporting.

BAH's report did not present the findings of the auditor from such testing.

BAH's report did not provide an evaluation of whether AWWSC's [the Service Company's] internal control structure and procedures include maintenance of records that in reasonable detail accurately and fairly reflect the transactions reported to BAH by AWWSC.

BAH' report did not provide an evaluation of whether such internal control structure and procedures provide reasonable assurance that transactions are recorded as necessary to permit calculation of costs conforming to TRA requirements, and that receipts and expenditures underlying those costs are being made only in accordance with authorizations or management and directors in conformance with TRA rules.

BAH's report did not contain a description, at a minimum, of material weaknesses in such internal controls, and of any material noncompliance found on the basis of such testing.

Mr. Majoros summarized his opinions as follows:

BAH did not conduct a management audit in compliance with Sarbanes-Oxley requirements to determine whether all costs allocated to TAWC were incurred as a result of prudent or imprudent management decisions by TAWC's parent and the reasonableness of the methodology used to allocate costs to TAWC, as TRA specified in Docket No. 06-00290. The BAH Report is merely an expansion of the type of study Mr Baryenbruch submitted in Docket no. 06-00290 which led to the TRA's Sarbanes-Oxley requirement. BAH did not conclude audit test work of specific transactions to determine if they were the result of prudent or imprudent management decisions. Nor did he determine or verify if AWWSC's internal controls were designed to catch imprudent and unreasonable costs. The BAH Report is not useful for ratemaking purposes. None of the costs of the BAH Report should be charged to ratepayers in any way. Furthermore, I recommend disallowance of all AWWSC management fees and allocated costs until the originally specified audit is conducted and examined in a later proceeding.

---

[2]Booz Allen Hamilton refers to itself as a "Strategy and Technology Consulting Firm" on its website.

TAWC offered the testimony of Mark Manner, an attorney and purported expert on the Sarbanes-Oxley requirements, in rebuttal to Mr. Majoros' opinions. Mr. Manner provided an overview of the Sarbanes-Oxley Act of 2002, also known as the Public Company Accounting Reform and Investor Protection Act of 2002. According to Mr. Manner, the Act was designed to improve existing safeguards for protecting investors in public companies from corporate accounting fraud, primarily by improving the accuracy and reliability of public company disclosures and by strengthening the independence of accounting firms auditing those disclosures. Mr. Manner first gave a definition of a management audit:

[A] "management audit" is a broad and general term. It is often used to describe management consulting services that are used to assist in the evaluation of the performance of a company's management or operations. The precise scope of a "management audit" is generally subject to additional description or definition by the party requesting such an audit.

Mr. Manner went on to distinguish a "management audit" from a "financial statement audit" which he defined as an "evaluation or assessment of a [c]ompany's balance sheet, income statement, cash flow statement, and related notes. A financial statement audit leads to an audit report providing an opinion as to whether the financial statements of a company fairly present the financial positions and results of operations of a company in accordance with generally accepted accounting principles. He explained that the word "audit" for purposes of Sarbanes-Oxley is defined narrowly as an "examination of the financial statements of any issuer by an independent public accounting firm . . . ." Therefore, when Sarbanes-Oxley addresses "audit" requirements and standards it applies to financial statement audits of publically traded companies and does not apply to a "management audit". In Mr. Manner's pre-filed testimony, he was asked the question "what does Sarbanes-Oxley require for a "management audit" or for any other types of non-financial statement audits?" His response to this question is key to understanding his and TAWC's position regarding the 2006 Rate Case Final Order's requirement that TAWC's management audit be compliant with Sarbanes-Oxley:

Sarbanes-Oxley makes it clear that the independent public accounting firm that audits the AWWC [the Parent Company] financial statements, in this case PricewaterhouseCoopers ("PWC"), is prohibited from providing certain services that Sarbanes-Oxley defines as "non-audit" services" such as the management audit. This prohibition requires an independent third-party, other than AWWC's independent public accounting firm, to conduct the management audit. This requirement of independence for the management audit can be fulfilled by having another party, accounting firm or otherwise, conduct the management audit. AWWC complied with this requirement by hiring Booz Allen to conduct the management audit.

Otherwise, . . . Sarbanes-Oxley sets forth requirements for financial statement audits rather than management audits or other types of audits. This becomes obvious upon reviewing the Sarbanes-Oxley definition of "audit" that covers "an examination of the financial statements . . . for the purpose of expressing an opinion on such statements" and the definition of "non-audit services," which covers professional services "other

than those provided in connection with <u>an audit or other review of the issuer's</u> <u>financial statement</u>."

* * * *

Although Sarbanes-Oxley's applicability to management audits is limited to independence as discussed above, I note that the management audit filed in this case pursuant to the TRA Order is based on financial information underlying the financial statements of AWWC that were prepared and audited in compliance with applicable Sarbanes-Oxley provisions, and was from a company that was in compliance with applicable Sarbanes-Oxley provisions.(emphasis supplied, citations omitted).

Mr. Manner stated that the TRA Final Order in the 2006 Rate Case specified that the management audit should be performed in compliance with Sarbanes-Oxley, which Mr. Majoros incorrectly interpreted as requiring a financial audit process. It was Mr. Manner's opinion that the correct interpretation of the Order is that it was a "clear request that the management audit be prepared by an independent firm." He also reiterated that "the Booz Allen management audit incorporates and is underpinned by financial information from a Sarbanes-Oxley compliant company that flows from financial statements prepared and audited [by PWC] in compliance with Sarbanes-Oxley", thus the Booz Allen report satisfied the TRA's mandate that it be compliant with Sarbanes-Oxley.

Mr. Manner did not address Mr. Majoros's primary opinion the Booz Allen Report did not address whether all costs allocated to TAWC were incurred as a result of prudent or imprudent management decisions by TAWC's parent and the reasonableness of the methodology used to allocate costs to TAWC.

The Final Order contains the following discussion of how the panel determined attrition period revenues:

The panel adopted attrition period Revenues of $38,934,309. In doing so, the panel used a combination of the Company's, the Consumer Advocate's, and its own forecasts. The panel found neither the Company's nor the Consumer Advocate's methodology for forecasting residential and commercial average usage persuasive and instead performed its own analysis, examining average usage trends for the residential and commercial classes over the four years ended March 31, 2005, 2006, 2007 and 2008. The Authority adopted residential class attrition period revenues based on this methodology and the Company's forecasted number of bills. For commercial class, the analysis produced a result almost identical to the Company's forecast; therefore, the Authority adopted TAWC's commercial class attrition period revenue forecast.

The TRA, in addressing weather normalization adjustment (WNA) in the Final Order, noted that TAWC had inaccurately represented that the agency had previously adopted the model the Company used in forecasting residential and commercial average usage. The Order states:

In earlier TAWC rate case dockets, Docket Nos. 03-00118 and 04-00288, TAWC's revenues were settled. Although the parties in those dockets settled on the amounts proposed by TAWC, the settlements did not mention any agreed upon methodology for calculating those revenues. The Company's revenue forecast was adopted in Docket No. 06-00290; however, the Authority did not adopt or endorse TAWC's WNA model. In this docket, the panel did not adopt the Company's entire revenue forecast or the Company's WNA model. Nevertheless, the Authority adopted the Company's commercial class attrition period revenue in this docket because despite disagreeing with the Company's methodology, the result was reasonable.

TAWC projected Regulatory Expenses of $543,384 in its Petition. This amount included the unamortized portion of the 2006 Rate Case regulatory expenses and the estimated cost of the 2008 Rate Case. The Consumer Advocate estimated $341,868 for Regulatory Expenses for the attrition period and the CMA projected Regulatory Expenses in the amount of $287,111. The expenses incurred in this case were higher than the 2006 Rate Case due, according to TAWC, to contentious discovery and multiple pre-hearing motions and hearings. TAWC, in its brief, claims that the reasonableness of the Rate Case expenses was uncontested. This statement is not borne out by the filings and testimony of the intervenors on this issue. In fact, the intervenors argued that the attorneys' fees claimed by TAWC as part of its regulatory expense were not reasonable and should not be approved by the TRA. The TRA rejected the arguments of the intervenors, but did look at whether the expense of regulatory proceedings should be apportioned and determined that it would be appropriate for TAWC shareholders to bear a portion of the Company's rate case expense as follows:

The panel noted that in the future the Authority should closely examine the costs associated with rate case filings to determine the portions to be recovered from rate payers and shareholders. The panel voted to allow one-half of this docket's rate case expense of $275,000 in the calculation of the Regulatory Expense. The panel voted to have one-half of the rate case expense, the cost of the service study, the cost of the depreciation study, and the unamortized balance of the previous case amortized over a three year period. Thus, the panel adopted $194,852 as the Regulatory Expense for the attrition period.

In any water system, some water is lost through leaks or waterline breaks. Also, a portion of water provided to customers is not billed, for example water used in fighting fires and used in leak detection. The lost or unbilled water is referred to as unaccounted-for water (UfW). TAWC presented testimony that its UfW for the attrition year was 19.97 % which is approximately 5% higher than the industry standard for acceptable UfW of 15%. The Consumer Advocate and CMA, through expert testimony, cross-examination of TAWC witnesses and post-hearing briefs, made the argument that the amount of TAWC's chemical and fuel and power costs incorporated in rates should be adjusted by 15% to provide incentive for the Company to maintain its water system more efficiently and prevent wasted costs for non-revenue producing treated water.

TAWC presented testimony that although all water systems have UfW, a system

located in a mountainous area, such as Chattanooga, or that has older infrastructure, as does TAWC, may have more UfW than otherwise situated or newer systems. Based on these circumstances, TAWC argued that the 15% UfW industry standard should not apply to TAWC. The Company also presented evidence regarding its effort to reduce the level of UfW by introducing a non-revenue water program, increasing leak detection in the system and conducting a water audit.

There was also testimony a UfW standard of 15% has been generally accepted by at least two regulatory agencies in other states and is generally accepted in the water utility industry. In fact, Mr. Watson, the president of TAWC, admitted that the Company itself sets a 15 % UfW target for itself and that the 15% standard is a good industry average. CMA witness Michael Gorman recommended that an acceptable UfW standard should be no more than 15%. He based his recommendations on two studies relied upon by the water utility industry. The TRA determined in the Final Order that the 15% standard should apply to TAWC to encourage conservation of natural resources.

The issues presented for review are:

A.   Did the TRA err when it employed a rate-making methodology that utilized more than one test year?

B.   Whether the TRA's determination of management fees was arbitrary and capricious or in violation of Tenn. Code Ann. § 65-5-103?

    1.   Whether the TRA's decision to disallow recovery of the expense of a TRA ordered management audit was arbitrary and capricious?

C.   Whether the TRA properly normalized revenues using a reasonable weather normalization adjustment methodology?

D.   Whether the decision to reduce the recovery of rate case expense was a lawful exercise of discretion supported by material and substantial evidence?

E.   Whether the TRA's decision to cap unaccounted-for water at 15% was a lawful exercise of discretion supported by material and substantial evidence?

This Court's review of the TRA's actions is confined to the record. Tenn. Code Ann. §4-5-322(g). The standard of review to be employed by the Court is provided by Tenn. Code Ann. §4-5-322(h) as follows:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

-14-

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

This Court's review is for the "very limited purpose of determining whether the Commission has acted arbitrarily, or in excess of jurisdiction, or otherwise unlawfully." *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980)(citing *City of Whitwell v. Fowler*, 208 Tenn. 80, 83, 343 S.W.2d 897, 899 (1961)). Review is restricted to the record and the TRA's finding may not be reversed or modified unless arbitrary or capricious or characterized by an abuse, or clearly unwarranted exercise of discretion and must stand if supported by substantial and material evidence. *Id.* The Tennessee Supreme Court discussed the degree of deference the reviewing court should give to the administrative agency as follows:

> The criteria by which the [Authority] should be guided have received only generalized comments in our reported decisions. This is proper because the courts are playing a limited role in reviewing actions which essentially are legislative in character. Rate making is not a judicial function and we accord the [Authority] great deference in reviewing its decisions. On fixing rates in general the Court has spoken in terms of what is just and reasonable "under the proven circumstances," of "regard to all relevant facts" and to a rate "in the zone of reasonableness."

*C. F. Indust.* at 542 (citing *Southern Bell T. & T. Co. v. Tennessee Public Serv. Com'n.*, 202 Tenn. 465, 304 S.W.2d 640 (1957)).

Moreover, this Court will not disturb a reasonable decision of an agency with expertise, experience and knowledge in the appropriate field. *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984)(citing *Griffin v. State,* 595 S.W.2d 96, 99 (Tenn. Crim. App. 1980)). There is also a presumption that the rates so established are correct and any party who attacks the Commission's findings has the burden of proving that they are illegal or unjust and unreasonable. *CF Indus*. at 540 (citing *Southern Bell T. & T. Co.*, 202 Tenn. 465, 304 S.W.2d 640 (1957)). When the rates set by the agency are attacked there is a heavy burden on those who attacked them to make a convincing showing that the rates are invalid. *S. Bell Tel. & Tel. Co.*, 304 S.W.2d at 649.

This Court discussed the standards of review for Tenn. Code Ann. § 4-5-322(h)(4) and Tenn. Code Ann. § 4-5-322(h)(5) in *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993) with specificity, as follows:

The standards of review in Tenn. Code Ann. § 4-5-322(h)(4) and Tenn. Code Ann.

§ 4-5-322(h)(5) are narrower than the standard of review normally applicable to other civil cases. They are also related but are not synonymous. Agency decisions not supported by substantial and material evidence are arbitrary and capricious. *C.F. Indus., Inc. v. Tennessee Public Serv. Comm'n,* 599 S.W.2d 536, 540 (Tenn.1980); *Pace v. Garbage Disposal Dist. of Washington County,* 54 Tenn. App. 263, 266, 390 S.W.2d 461, 463 (1965). However, agency decisions with adequate evidentiary support may still be arbitrary and capricious if caused by a clear error in judgment. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974); *Girard v. City of Glenn Falls,* 173 A.D.2d 113, 577 N.Y.S.2d 496, 499 (1991); 5 Kenneth C. Davis, *Administrative Law Treatise* § 29:7, at 358 (2d ed. 1984).

A reviewing court should not apply Tenn.Code Ann. § 4-5-322(h)(4)'s "arbitrary and capricious" standard of review mechanically. In its broadest sense, the standard requires the court to determine whether the administrative agency has made a clear error in judgment. *American Paper Inst. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 413, 103 S.Ct. 1921, 1928, 76 L.Ed.2d 22 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971). An arbitrary decision is one that is not based on any course of reasoning or exercise of judgment, *State ex rel. Nixon v. McCanless,* 176 Tenn. 352, 354, 141 S.W.2d 885, 886 (1940), or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion. *Wagner v. City of Omaha,* 236 Neb. 843, 464 N.W.2d 175, 180 (1991); *Ramsey v. Department of Human Servs.,* 301 Ark. 285, 783 S.W.2d 361, 364 (1990).

Likewise, a reviewing court should not apply Tenn.Code Ann. § 4-5-322(h)(5)'s "substantial and material evidence" test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." *Clay County Manor v. State Dep't of Health & Environment,* 849 S.W.2d 755, 759 (Tenn.1993); *Southern Ry. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn.1984). The court need not reweigh the evidence, *Humana of Tennessee v. Tennessee Health Facilities Comm'n,* 551 S.W.2d 664, 667 (Tenn.1977), and the agency's decision need not be supported by a preponderance of the evidence. *Street v. State Bd. of Equalization,* 812 S.W.2d 583, 585 (Tenn.App.1990). The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed. *Wayne County v. Tennessee Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 279 (Tenn.App.1988).

*Jackson Mobilphone* at 110 - 111.

The substantial and material evidence standard has been described as requiring "something less than a preponderance of the evidence . . . but more than a scintilla or glimmer." " *Bd. of Prof'l Responsibility v. Allison,* 284 S.W.3d 316, 322 (Tenn.2009)(citing *Jones v. Bureau of TennCare,* 94 S.W.3d 495, 501 (Tenn.Ct. App.2002)).

The TRA's conclusions of law are subject to a *de novo* review without a presumption of correctness. *Tennessee Envtl. Council, Inc. v. Tennessee Water Quality Control Bd.*, 254 S.W.3d 396, 402 (Tenn. Ct. App. 2007).

A fundamental tenet of the legislative function of ratemaking requires the balancing of the utility's interest in performing its public duties and earning a reasonable return on investment. *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 691 - 693 (1923). Rates are set for the future, and the estimated effect of all reasonably expected changes affecting the rate of return, including increases in expenses and investments, must be taken into consideration in the establishment of a rate. *Am. Asss'n. of Retired Persons v. Tenn. Pub. Sev. Comm'n.*, 896 S.W. 2d 127, 133 (Tenn. Ct. App. 1995). Thus, " a rate should be reasonable not only when it is first established but also for a reasonable time thereafter." *Southern Bell Tel. & Tel..* 304 S.W. 2d at 647(citing *McCardle v. Indianapolis Water Co.*, 272 U. S. 400 (1926)).

A necessary component of utility ratemaking is the authority of TRA to "fix" just and reasonable rates, not simply to approve or deny a utility's request.   This Court, in *Consumer Advocate Div. v. Bissell*, noted:

> [T]he legislature has recognized that a public utility may set its own rates, subject to the PSC's power to suspend the rates for a certain period of time while it makes the utility prove that the rates are just and reasonable. *Cumberland Tel. & Tel. Co. v. Railroad and Public Utilities Commission,* 287 F. 406 (M. D.Tenn.1921). If the utility fails to carry that burden, the **agency has the additional authority to fix** rates that meet the just and reasonable criteria. *CF Industries v. Tennessee Public Service Commission,* 599 S.W.2d 536 (Tenn.1980).

*Bissell*, No. 01-A-01-9601-BC00049, 1996 WL 482970 at * 2 (Tenn. Ct. App. Aug. 28, 1996)(emphasis added).

In ratemaking proceedings, the burden of showing the proposed rates are just and reasonable rests with the utility seeking the change in rates. (Tenn. Code Ann. § 65-5-103(a).

TAWC argues that TRA's use of multiple test years was an arbitrary change of its policy unsupported by substantial and material evidence. In support of this argument it cites *United Cities Gas Co. v. Tennessee Public Serv. Com'n,* 789 S.W.2d 256 (Tenn. 1990). That case, however, held that "the administrative body is and must be free to change its mind and, if there is substantial and material evidence to justify the change, the courts have no reason to overturn the new holding. *Id*. at 259 (citing *Public Service Commission v. General Telephone Company, etc.,* 555 S.W.2d 395 (Tenn.1977)).

TAWC and TRA both set out the rate making methodology employed by the TRA in their briefs.  TAWC, relying in part on the testimony of the Consumer Advocate's witness, Terry Buckner,  explained that in rate cases, TRA uses a standard methodology to determine if the rates proposed by a utility are just and reasonable.  The utility selects a historical "test period" which is usually a recently completed  twelve month period.  Detailed information

regarding the utility's revenues, expenses, rate base and cost of capital for the selected test year is then analyzed. Based on the data from the selected test period, a forecast of revenues, expenses, rate base, and cost of capital is created for the "attrition period" or "attrition year", usually a twelve month period commencing approximately at the anticipated conclusion of the rate case. The attrition period is to be representative of the period of any rate adjustment and is also viewed as the first year during which the TRA's rate order will be applied. Mr. Buckner explained that the selection of the test year is quite important:

> The selection of the timing of the test year may be the most significant single factor in the rate-making process. The more outdated the test year levels operations, the more critical is the need for significant restatement to produce representative levels of future conditions.

Mr. Buckner went on to explain that in the 2008 Rate Case TAWC used a test year that ended November 2007 and an attrition year ending August 2009, whereas the Consumer Advocate used a test year ending March 2008 and its attrition year ending August 2009. He explained that the Consumer Advocate used the later test year "[i]n an effort to eliminate outdated financial information and to shorten the forecast window. . . . " *(Id.* at 0647).

The TRA stated in the Final Order that it is "not limited to adopting one test period for use throughout the case" and that both TAWC's and the Consumer Advocate's tendered test periods were acceptable and that it voted to use "the test period which best fits the individual items being forecasted." In addition, the TRA performed its own analysis for revenues and examined average usage trends over the four years ended March 2005, 2006, 2007 and 2008. The TRA then used this resulting revenue forecast to determine chemical and fuel expenses and it decided not to use a test period analysis when calculating management fees. TAWC contends that TRA's use of multiple test years in the 2008 Rate Case was a departure from its prior policy and that TRA had "expressly rejected the use of multiple test years in the 2006 Rate Case. TAWC claims that in the 2006 Rate Case, TRA stated that it rejected the multiple test periods utilized by Consumer Advocate and accepted TAWC's uniform test period. However, TAWC's contention that TRA rejected the use of multiple test periods is not born out by the June 10, 2008 Order in the 2006 Rate Case. That Order states as follows:

> The Company selected a historical test period of the twelve months ended June 30, 2006 and an attrition period of the twelve months ending February 29, 2008. . . .

> The CAPD used a test period of the twelve months ended December 31, 2006 for Revenues. The CAPD used a test period of the twelve months ended October 31, 2006 for the majority of Operations and Maintenance Expenses. For labor related expenses, the CAPD adopted the Company's actual employee level as of January 31, 2007. The CAPD forecast the Plant in Service and Accumulated Depreciation was based on actual balances at December 31, 2006 plus monthly additions and retirements as provided by the Company. The attendant depreciation expense was calculated upon resulting balances. . . .

The panel rejected the multiple test periods utilized by CAPD to forecast Revenues and Expenses and accepted the Company's uniform test period of the twelve months ended June 30, 2006 for Revenues and Expenses, except in the instance of Insurance Other Than Group where abnormal monthly bookings were noted. Further, the panel voted to accept the test period of the twelve months ended June 30, 2006 for Revenues and Expenses, except in the instance of Insurance Other Than Group where abnormal bookings were noted. Further the panel voted to accept the test period of the twelve months ended June 30, 2006 for Rate Base components to which the Company and the CAPD agree in their projections. For Rate Base components to which there was dispute among the Parties, the panel adopted the actual average thirteen month ending at December 31, 2006. . . .

(Final Order, TRA Docket No. 06-00290, June 10, 2006, pp. 19 - 20 (2006 Rate Case )).

The foregoing excerpt from the Final Order from the 2006 Rate Case shows that while TRA did not accept the specific multiple test periods advocated by CAPD for various factions of the rate case, it did not reject the use of multiple test periods when it found them appropriate. In fact, TRA specifically rejected TAWC's test period of the twelve months ending on June 30, 2006 for the Rate Base components that were in dispute among the parties, and instead, applied a test period ending December 31, 2006. *Id.*

Accordingly, TAWC's contention that TRA's use of multiple test periods in the 2008 Rate Case was an arbitrary change of policy that is unsupported by the substantial and material evidence fails, as the Final Order from the 2006 Rate Case clearly shows that TRA utilized more than one test year in that case. [3]

We note that the TRA's discretion with regard to setting rates and the manner in which the agency utilizes test periods is settled law. The TRA has the discretion to utilize an historical test period, a forecast period, a combination of these where necessary, or any other accepted method of rate making necessary to give a fair rate of return. *Powell Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 660 S.W.2d 44, 46 (Tenn. 1983); *Am. Ass'n of Retired Persons v. Tennessee Pub. Serv. Comm'n*, 896 S.W.2d 127, 133 (Tenn. Ct. App. 1994). The Supreme Court in *Powell* noted that "there is no statutory nor decisional law that specifies any particular approach that must be followed by the Commission. Fundamentally, the establishment of just and reasonable rates is a value judgment to be made by the Commission in the exercise of its sound regulatory judgment and discretion." *Powell* at 46 (citing *CF Industries.,* 599 S.W.2d at 542.

Accordingly, neither the courts nor the legislature has established any precise method or formula in setting rates, and the TRA is not bound by any particular approach. *CF*

_____

[3] The City of Chattanooga appealed the decision of the TRA in the 2006 Rate Case. TAWC, as appellee, did not raise the issue of whether TRA's use of more than one test period in the 2006 Rate Case was an arbitrary derivation from standing TRA policy. *See City of Chattanooga v. Tennessee Regulatory Auth.*, M2008-01733-COA-R12-CV, 2010 WL 2867128 (Tenn. Ct. App. July 21, 2010).

*Industries,* 599 S.W.2d at 543. As the TRA noted in the Final Order of the 2008 Rate Case, it is not limited to adopting one specific test period in order to make known and measurable adjustments to produce just and reasonable rates. There is simply no requirement that the TRA utilize the specific test period proposed by a public utility.

TAWC contends that the TRA's Final Order in the 2008 Rate case regarding management fees was arbitrary and capricious and violated Tenn Code Ann. § 65-5-103 as it was not supported by substantial and material evidence, did not allow recovery for reasonably expected expenses and was based on the TRA's disregard of overwhelming undisputed evidence. TAWC also contends that the TRA was in error when it rejected TAWC's projected attrition year management fees of $4,335,190 and, instead, set the management fees for the attrition year at $3,529, 933. TAWC finds fault with the TRA's setting of management fees based on the amount TAWC forecasted for 2005 in a 2004 Rate Case, which TRA then adjusted upward for inflation and customer growth.

While TAWC contends that its request for management fees of $4,335,190 was supported by"overwhelming undisputed evidence" this is not supported by the record. The record shows that the City and Consumer Advocate presented a vast amount of substantial and material evidence that not only contradicted the evidence put forth by TAWC but supported the final decision made by the TRA. The issue of the management fees requested by TAWC and the Booz Allen Report are inextricably intertwined in the reasoning and Final Order of the TRA in this case. The City and the Consumer Advocate produced extensive evidence regarding the deficiencies of the Booz Allen Report, some of which are detailed heretofore. The TRA was obviously persuaded by this evidence as it concluded in the Final Order that the Booz Allen Report did not adequately address the prudency of the charges imposed on TAWC by the Service Company.

The record in this case demonstrates that the TRA did not act arbitrarily in limiting the amount of management fees for TAWC. In its broadest sense, the arbitrary and capricious standard requires this Court to determine whether the administrative agency has made a clear error in judgment or a decision not based on any course of reasoning or exercise in judgement. *Jackson Mobilphone*, 876 S.W.2d at 110-11. The TRA's decision to reject the Booz Allen Report and other evidence submitted by TAWC to substantiate its projected management fees is supported by material and substantial evidence submitted by the intervenors that a "rational mind might accept to support a rational conclusion". Thus, TAWC did not meet its "heavy" burden of proof that it was entitled to recover $4,335,190 for management fees. Accordingly, we affirm the TRA's decision to award a lessor amount for management fees than requested by TAWC, which was an appropriate exercise of the agency's discretion.

TAWC also appeals the TRA's finding that Booz Allen did not conduct an independent audit as required by the Final Order in the 2006 Rate Case. The TRA found that Mr. Van den Berg, who sponsored the Booz Allen Report, was not independent of TAWC because he had testified on behalf of the Company before the TRA and in other states as an expert witness on behalf of the Parent Company. TAWC contends that the independence imposed by TRA in its Final Order in the 2008 Rate Case was never required in the Final

Order in the 2006 Rate Case. This argument is contrary to the testimony of two of TAWC's own witnesses. The Final Order in the 2006 Rate Case mandated that the management audit be in compliance with Sarbanes-Oxley requirements. Mr. Van den Berg and Mr. Manner testified that the only requirement contained in Sarbanes-Oxley that pertains to a management audit or a non-financial audit was that the audit be conducted by an independent firm. As the Final Order in the 2006 Rate Case required compliance with Sarbanes-Oxley and Sarbanes-Oxley requires a nonfinancial auditor to be independent of the company being audited, the Final Order mandated independence. We find this argument without merit.

There is, however, a valid question as to whether the TRA's finding that Booz Allen was not independent of TAWC was correct. Mr. Manner and Mr. Van den Berg, testifying on behalf of TAWC, both stated that the independence requirement in Sarbanes-Oxley as to non-financial statement audits means that such an audit could not be conducted by the financial auditors who conducted financial audits for a company. They both interpreted this provision to mean only that PricewaterhouseCoopers, the financial auditors for TAWC, could not have conducted the management audit of TAWC under the independence requirement of Sarbanes Oxley. Thus, TAWC takes the position that if independence had been required by the Final Order, then Booz Allen was an independent auditor as it was never TAWC's financial auditor. The TRA and the other appellees contend that because Mr. Van den Berg had acted as an expert witness for TAWC and its Parent Company in other matters, he was an advocate for the company and could not be independent. The TRA also points to the testimony of Mr. Van den Berg that he submitted a draft of the Booz Allen Report to TAWC to review and make corrections before he put it in final form as proof that he did not conduct an independent audit. In fact, Mr. Van den Berg stated that TAWC did make some changes to the facts presented in the draft report but made no modification of the analysis. However, we have already affirmed the TRA's rejection of TAWC's requested management fees on another basis, i.e., that TAWC did not meet its burden of proof to show that the charges it requested were prudent.

TAWC also appeals the TRA's setting the projected management fees for the attrition year at $3,529,933 based on the management fees forecasted for 2005 with an upward adjustment for inflation and customer growth. This methodology was advanced by the Consumer Advocate and accepted by the TRA only after the agency determined that the Booz Allen Report and the other evidence presented by TAWC was insufficient to meet TAWC's burden of proof as to the prudency of the Service Company's charges to TAWC.

This issue was addressed by the TRA panel at the hearing. Director Roberson stated that he had no doubt that the Service Company had incurred legitimate expenses, but he could not determine whether the amount of management fees requested by the Company was "a just and reasonable amount based on prudent expenditures" from the Booz Allen Report. He then recommended adopting the methodology advanced by the Consumer Advocate as a way to include management fees in the rate. Director Roberson made it clear that once TAWC had a properly prepared comprehensive management audit done, the TRA would revisit the matter of management fees if the audit showed that the management fees requested were prudent. Accordingly, the Final Order left the 2008 Rate Case open so that TAWC could have the opportunity to obtain a properly conducted management audit in compliance

with the Order and submit it to the TRA for consideration. This audit was to be filed within six months of September 22, 2008. Until such time as a management audit was submitted to the TRA, the agency, in recognition that TAWC had incurred some management fees, set the management fees at $3,529,933. [4]

TAWC objects to the TRA utilizing the methodology proposed by the Consumer Advocate on the basis that the agency had rejected the same methodology, which had also been proposed by the Consumer Advocate, in the 2006 Rate Case. TAWC contends that the TRA's use of this methodology was not supported by the record, failed to give substantial weight to the TRA's 2006 Order and was made without good cause and prior notice to the parties. TAWC maintains that the 2005 forecast made in 2004 Rate Case is not material and there is substantial evidence to support such a decision on management fees in the 2008 Rate Case.

Based on the Authority's finding as to the inadequacy of the Booz Allen Report, there was no substantive evidence before the TRA to support the reasonableness, necessity and prudence of the increase in management fees sought by TAWC. The transcript of the panel's deliberations makes clear that the members accepted that some management fees had been incurred by TAWC. Left with such an evidentiary vacuum, caused by TAWC, the agency used its discretion and arrived at its own value judgment based on its findings in the 2004 Rate Case. The management fees set by the TRA were to be revisited within six months upon a filing of an appropriate management audit by TAWC. The setting of just and reasonable rates is a value judgment to be made by the TRA in the exercise of its sound regulatory judgment and discretion. *CF Indus.* 599 S.W.2d at 542. The TRA recognized the need to set management fees but found that it was provided with inadequate proof as to the prudence of the fees requested by TAWC. Using the fees from 2005 was a reasonable, temporary solution to the dilemma until TAWC could submit a proper management audit. As noted, the arbitrary and capricious standard requires this Court to determine whether the administrative agency has made a clear error in judgment or a decision not based on any course of reasoning or exercise in judgement. *Jackson Mobilphone*, 876 S.W.2d at 110-11. We hold this action was not arbitrary and capricious and the use of the 2005 management fees, under the circumstances, was not error.

TAWC argues that the TRA erred when it disallowed TAWC's request to recover $285,000 it paid for the preparation of the Booz Allen Report. To support this position, TAWC makes the same argument it made regarding its argument that the TRA erred when it did not accept the findings of the Booz Allen Report. The TRA panel concluded that the Booz Allen Report did not comply with the Final Order in the 2006 Rate Case because it did not adequately address the prudency of the management fee and because Mr. Van den Berg, the sponsor of the Report, was not independent as required by Sarbanes-Oxley. Based on this finding, the TRA declined to include the cost of the Report in the requested rate. As noted, we find that there was substantial and material evidence in the record to support the TRA's finding that the Booz Allen Report was inadequate because it did not sufficiently address

---

[4] The record does not establish whether a management audit was submitted within the six month period or, if one was presented to the TRA, or whether the management fees were adjusted.

whether the costs allocated to TAWC were incurred as a result of prudent management decisions. We hold the TRA did not abuse its discretion when it declined to accept the management fees requested by TAWC. We also find that as the Booz Allen Report could not be used by the TRA to determine whether the requested fees were prudent and necessary, the rate payers should not be required to pay for the cost of the Report. The TRA's disallowance of the cost of the report is affirmed.

TAWC claims, that in calculating revenues, the TRA departed from its long-standing practice by rejecting the use of a weather normalization adjustment (WNA) methodology based on data collected over an extended number of years without substantial and material evidence to justify the change. The Consumer Advocate, in its brief, explained "normalization" in the rate-making context: "In setting just and reasonable rates, it is standard practice to attempt to "normalize" or adjust projections of revenues and expenses for a variety of know and measurable changes. If such adjustments are not made, revenues and expenses may dramatically exceed or drastically fall short of expectations with a variety of consequences for consumers and TAWC." The revenues of a water utility can be effected by the amount of precipitation experienced in the utility's area. A drought may cause consumers to use more water for watering their lawns and a period of excessive rain may cause the consumers to use less water. In rate-making the forecasting of revenues is an essential element in the process. If revenues are projected to be lower in the future and expenses are expected to rise, the revenue requirement, and thus the rates, will be higher. Therefore, if water usage per customer is predicted to decrease, rates will need to be higher to cover expenses. Here, TAWC's proposed WNA methodology projected a reduction in revenue of approximately $1.3 million dollars.

As part of the 2008 Rate Case, TAWC introduced testimony from its expert witness, Dr. Edward Spitznagle, a professor of mathematics and statistics. Dr. Spitznagle explained that he tested several models for weather normalization and concluded that soil moisture was the most accurate predictor of future water consumption. Dr. Spitznagle employed a set of soil moisture data that was complied over the past thirty years to normalize the forecast and is set out in the Palmer Drought Severity Index (PDSI). The Company's projected attrition period Revenues was $37,142,460. The Consumer Advocate forecasted revenue for the attrition period at a higher level, $39,492,768 and made no normalizing adjustments. The TRA panel adopted attrition period revenues of $38,934,309 by using a combination of the Company's, the Consumer Advocate's, and its own forecast. In its Final Order, the TRA explained that it "found neither the Company's nor the Consumer Advocate's methodology for forecasting residential and commercial average usage persuasive and instead performed its own analysis, examining average usage trends for the residential and commercial classes over the four years ended March 31, 2005, 2006, 2007 and 2008." The TRA explained that it adopted residential class attrition period revenues based on this methodology and the Company's forecasted number of bills. For the commercial class, the TRA's analysis produced almost the identical result the TAWC had arrived at, thus it adopted the TAWC's commercial class attrition period forecasted revenue.

TAWC claims that TRA had consistently approved the use of weather normalization for forecasting revenue in prior rate cases. The TRA, however, rejected this claim explicitly

in the Final Order when it stated:

> As to the weather normalization adjustment ("WNA"), the Company made representations that the model it used in forecasting residential and commercial average usage had be previously adopted by the Authority. Not withstanding an occasional concurrence by Intervenor witnesses, this assertion is incorrect. In earlier TAWC rate case dockets, Docket Nos. 03-00118 and 04-00288, TAWC's revenues were settled. Although the parties in those dockets settled on the amounts proposed by TAWC, the settlements did not mention any agreed upon methodology for calculating those revenues. The Company's revenue forecast was adopted in Docket No. 06-00290; however, the Authority did not adopt or endorse TAWC's WNA model. In this docket, the panel did not adopt the Company's entire revenue forecast or the Company's WNA model. Nevertheless, the Authority adopted the Company's commercial class attrition period revenue in this docket because despite disagreeing with the Company's methodology, the result was reasonable.

TAWC responds to the TRA's denial in the Final Order that it had "adopted" WNA methodology by stating that the TRA's incorporation of TAWC's WNAs into the orders approving settlement in Docket Nos. 03-00118 and 04-00288 and express adoption of TAWC's revenue adjustments in the 2006 Rate Case [Docket No. 06-00290] undermines the TRA's denial that it had adopted the WNA methodology. TAWC argues that "it is clear that the TRA has in practice routinely accepted and reinforced the use of WNA methodology in attrition year revenue projections, and the TRA's rejection of the WNA methodology in the instant matter departs from this precedent." TAWC goes on to claim, without citation to statute or case law, that under Tennessee law, the TRA may not alter its long-standing policy of using WNA for revenue projections unless there is substantial and material evidence supporting and justifying the decision. TAWC claims that the TRA did not make its decision to reject the methodology supported by TAWC based on substantial and material evidence and did not explain why it rejected the methodology. Tennessee law, however, does not provide that the TRA is bound to follow rate-making methodology it has employed in the past. The Tennessee Supreme Court discussed in detail the process of rate-making in *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536 (Tenn. 1980) and explained why the TRA's predecessor, the Tennessee Public Service Commission, was not bound by any one rate-making methodology as follows:

> The criteria by which the Commission should be guided have received only generalized comments in our reported decisions. This is proper because the courts are playing a limited role in reviewing actions which essentially are legislative in character. Rate making is not a judicial function and we accord the Commission great deference in reviewing its decisions. On fixing rates in general the Court has spoken in terms of what is just and reasonable "under the proven circumstances," of "regard to all relevant facts" and to a rate "in the zone of reasonableness." *Southern Bell Telephone & Telegraph Co. v. Tennessee Public Service Com'n.*, 202 Tenn. 465, 304 S.W.2d 640 (1957).

The Uniform Administrative Procedures Act authorizes the agency to take notice of

-24-

"generally recognized technical and scientific facts within the agency's specialized knowledge," and in the evaluation of evidence the agency is specifically authorized to utilize its "experience, technical competence, and specialized knowledge." Section 4-5-1097, T.C.A.

Thus, the Public Service Commission in rate making and design cases is not solely governed by the proof although, of course, there must be an adequate evidentiary predicate. **The Commission, however, is not hamstrung by the naked record. It may consider all relevant circumstances shown by the record, all recognized technical and scientific facts pertinent to the issue under consideration and may superimpose upon the entire transaction its own expertise, technical competence and specialized knowledge. Thus focusing upon the issues, the Commission decides that which is just and reasonable. This is the litmus test nothing more, nothing less.**

In *United Inter-Mountain Telephone Co. v. Public Service Com'n*, 555 S.W.2d 389 (Tenn.1977), this Court noted that "(t)he impact of the Administrative Procedures Act on the review of the decisions made by state boards, commissions and agencies, including the Public Service Commission, is massive " (emphasis supplied), and pointed out that "(i)t casts upon the Commission the heavy burden of a sound, reasoned, and judicious approach in the exercise of its jurisdiction." 555 S.W.2d at 392.

We reiterate that neither the legislature nor the courts have established any precise formula or yardstick to guide the Commission. As pointed out by the Georgia Supreme Court in *Allied Chemical Corp. v. Georgia Power Co.*, 224 S.E.2d 396 (Ga.1976): The process of setting rates is not required to follow any particular course, so long as the end result does not violate the "just and reasonable requirement" requirement . . . . 224 S.E.2d at 399.

The Oklahoma Supreme Court, in Application of Arkansas Louisiana Gas Co., 558 P.2d 376 (Okl.1976), pointed out:

> Commission is not bound by a single formula or a combination of formulas in fixing rates and none is exclusive or more favored than the others. (citation omitted) There is no precise statutory or court announced basis for determining the justness or reasonableness of class rate level structures or relationships, the Court generally holding that rate making is the responsibility of a regulatory commission effectively exercising its discretion upon sufficient evidence before it. 558 P.2d at 379.

Finally, we adopt the concise and correct conclusions of the Minnesota Supreme Court in St. Paul Area Chamber of Commerce v. Minnesota Public Service Com'n., 312 Minn. 250, 251 N.W.2d 350 (1977):

> (W)e must presume that the members of the commission itself, with their

supporting staff, have in their grasp practical knowledge in the field of utilities regulation not possessed by either the courts or laymen in general.

The commission, in order to carry out its mandate from the legislature to establish "just and reasonable" rates, must be able to draw on its own internal sources of knowledge and experience. As with the legislature itself, we assume that it does so in each instance and that we ought not to interfere unless it should clearly exceed its statutory powers. 251 N.W.2d at 354.

We cannot say on this record that the Commission exceeded its regulatory judgment and discretion in acting without a cost of service study in a rate design case. The imposition of this requirement would be an unwarranted intrusion into the rate making process.

*CF Indus.*, 599 S.W.2d., 542-43(emphasis added); *see also Powell Tel. Co.*, 660 S.W.2d at 46.

Based on the Supreme Court's pronouncements in *CF Industries,* the TRA is not required to follow a  particular methodology it has used in the past as long as the methodology it chooses allows it to arrive a determination of a rate that is just and reasonable.  Moreover, the TRA is not limited to considering just what is in the record as it may consider, in addition to the proof, "recognized technical and scientific facts pertinent to the issue" and  may "superimpose . . . its own expertise, technical competence and specialized knowledge."

TAWC's contention that the TRA must use WNA as part of its revenue projection methodology is without merit.  The TRA is only required to use its regulatory judgment and exercise its discretion to decide what is a just and reasonable rate.

The TRA's rejection of TAWC's proposed use of WNA calculations is amply supported by material and substantial evidence in the record.  The consistency and end result of the proposed WNA was challenged by the intervenors, particularly the Consumer Advocate.  Terry Buckner, testifying for the Consumer Advocate, explained that in the 2006 Rate Case, the impact of Dr. Spitznagle's WNA was a $221,000 downward adjustment to the projected revenue for the attrition year.  This projection, when examined in retrospect, was incorrect as TAWC's revenues after the 2006 Rate Case actually increased. Mr. Buckner went on to explain that notwithstanding this result, a year later, Dr. Spitznagle's WNA revenue adjustment jumped downward again from $221,000 to $1.36 million in the 2008 Rate Case.

According to Mr. Buckner, after little more than updating the model to include a slightly different 30 year picture of PDSI data, the WNA's calculation resulted in a rate adjustment six times greater than the adjustment proposed in the 2006 Rate Case.  *Id.*

The Consumer Advocate's witness also stated that the final result of the WNA model relied on by Dr. Spitznagle produced a result that defied common sense.  His model

calculated that residential consumers will use 141 gallons of water per day. Based on the WNA model's projections, TAWC would sell less water to residential customers than it did in 2004 when customers were estimated to use 146 gallons of water a day. According to PDSI data in the record, 2004 was the fourth wettest year in Chattanooga out of 113 years. Thus, the WNA model relied on by TAWC projected that the Company would sell less water under "normal weather conditions" than it did during one of the wettest years on record. The Consumer Advocate concluded that given that 2004 was an exceedingly wet year and that the record shows that TAWC was delivering water to 3,000 more residential customers in 2008 than it did in 2004, "the end result of Dr. Spitzenagel's WNA mode defies economic reality" and is not reasonable and credible.

Dr. Spitzenagel testified that while his WNA models had been used in three rate cases before the TRA filed since 2003, he had only reviewed the accuracy of these WNA forecasts by comparing them to the actual revenue for one of those years. A retrospective comparison of the models' results with the real revenues would have been a simple exercise to demonstrate the accuracy or inaccuracy of the Company's WNA forecasts. The record also shows that TAWC relied on Dr. Spitznagle's analysis that showed a marked decline in water usage over the past thirty years. However, the intervenors showed that, in fact, water usage over ten-year, five-year and three-year average periods show the decline in usage has ended.

Evidence was introduced at the hearing that called into question the value of the PDSI, the drought index employed by Dr. Spitznagle to calculate the WNA. In a publication by the National Academy of Sciences, the water regression analysis used by Dr. Spitznagle was addressed and the limitations of the use of the PDSI was noted with references to specific academic criticism of the PDSI. This publication was introduced into evidence and after the hearing, the TRA formally took administrative notice of the publication. There was further evidence in the record that the use of the PDSI for normalizing water usage by public utilities is not widespread.

When the TRA rejected the weather normalization methodology sponsored by TAWC, its decision was clearly supported by substantial and material evidence in the record. As explained in the Final Order, after considering the testimony of the expert witnesses presented by the parties, the TRA exercised its discretion and utilized its own experience, knowledge and expertise in its determination of the weather normalization adjustment to project revenues. The TRA conducted its own analysis based an examination of average usage trends for the residential and commercial classes over a four-year period. The years used in this analysis, 2005 - 2008, included periods of drought and high amounts of rainfall. The TRA's use of an average of usage trends over the four year period took into account the impact of weather as well as other impacting factors is accounted for and built into the consumer usage utilized in the analysis. The TRA took the results of this methodology and adopted normalized revenues for the residential customers that was independent of the forecasts proposed by both the Company and the Consumer Advocate. *Id.* The results arrived at by the TRA for the commercial customers was almost identical to that proposed by TAWC, thus the TRA adopted the Company's forecast for that class of consumers. *Id.* There was evidence to show that the methodology used by the TRA based on years of actual consumer usage is a common method of normalizing revenues for water utilities. Based on

the foregoing, the methodology utilized by the TRA was a common and accepted practice, based on material and substantial evidence and was within the TRA's sound regulatory judgment.

TAWC contends that the TRA's decision to reduce the Company's recovery of Rate Case Expenses was an unlawful exercise of discretion and unsupported by material and substantial evidence. The Company argues that the award of $275,000, only half of its projected expenses, should be reversed because: (1) the decision represents a change in policy without substantial and material evidence to support the change; (2) the decision disregards the facts and circumstances of the case without providing any rationale or explanation that might lead a reasonable person to draw the same conclusion; and (3) the decision violates Tenn. Code Ann. § 65-5-103's "just and reasonable" standard by failing to take into consideration the estimated effect of reasonably expected expenses".

In support of its contention that the TRA departed from its usual policy and custom of allowing utilities recovery of rate case expenses, the Company cites to the following three cases where such an award was made. In the 2006 Rate Case, In *In re Aqua Utilities Co.,* and *In re Chattanooga Gas Co.*

TAWC contends that by disallowing one half of the Company's proposed rate case expenses, the TRA "made and abrupt and unexpected change in the sound policy of allowing full recovery of rate case expenses without any explanation or substantial and material evidentiary support for the change." TAWC further argues that the change in "policy" was particularly inappropriate because the TRA concluded that a rate increase was needed, although the approved increase was less than the Company had requested.

TAWC states that the expense of the rate case was reasonable, necessary and conservative given how highly contentious and heavily litigated the 2008 Rate Case was. We acknowledge that extensive discovery, multiple motions and multiple hearings occurred in the pre-hearing phase of the 2008 Rate Case. At the hearing itself multiple witnesses filed prepared testimony and testified before the panel. The record on appeal consists of sixty-two volumes and 9319 pages, the hearing transcript is contained in twenty-two volumes and is 2240 pages. We recognize and accept that this work was generated at considerable expense.

TAWC states that no substantial and material evidence was offered that the rate expenses sought were unreasonable and that the evidence offered by TAWC regarding the reasonableness of the expenses was not contradicted by any party. The Company cites the Consumer Advocate's witness, Mr. Buckner, as testifying that the number of issues being contested and the complexity of those issues necessarily increases the costs of rate cases.

On appeal, the TRA does not dispute that reasonable and properly incurred expenses associated with a rate case should be recoverable by a utility. In support of this concept, the TRA cites to *W. Ohio Gas Co. v. Pub. Utilities Comm'n of Ohio*, 294 U.S. 63, 68, 55 S. Ct. 316, 319, 79 L. Ed. 761 (1935) wherein the United States Supreme Court held that a public utility cannot include negligent or wasteful losses among its operating charges in a rate proceeding and only property and necessary expenses should be recovered. The TRA

acknowledges that it is through the rates approved by the TRA and paid by the utility's customers that TAWC recovers all of its necessary operating expenses. However, TRA takes the position that the ability of a utility to recover its expenses is not "absolute nor immutable" and it is "neither arbitrary or capricious when, in the exercise of its judgment and discretion, the Authority disallows recovery of expenses that it deems unnecessary, improvident, or improper."

The TRA goes on to justify its decision to allow only one-half of the rate case expenses proposed by TAWC and leave the remaining half to be paid by the Company's shareholders by providing details of the costs of the "four labor-intensive utility cases [filed] in the five years spanning 2003 through 2008". According to the agency, the total requested rate case expenses associated with those four cases was $1.325 million although the actual expenses were estimated to be in excess of $1 million each for the 2006 and 2008 rate cases. The TRA, in its brief expresses its growing concern that TAWC has developed a distinct pattern of filing "increasingly frequent and progressively more costly rate cases . . . in rapid succession . . . . " The TRA states in its brief, "particularly in light of its poor history of substantiating the requests [for regulatory expenses] that it makes, demonstrating little restraint, the Company's expectation of passing on larger and larger rates case expenses year over year to its ratepayers, is inexplicable and untenable."

The TRA makes clear in its appellate brief that it disapproves of the TAWC's trend of filing frequent, increasingly expensive and litigious rate cases and even went as far as to contend that "in light of the Company's history and pattern of filing unsubstantiated rate cases, particularly evident in this case, the inordinate costs involved here are unreasonable. However, the record and Final Order are devoid of the foregoing accusations made by the TRA about TAWC. The record and Final Order do not explain what specific expenses the TRA deemed unnecessary, improvident, or improper or that the Authority closely examined the costs associated with the rate case to determine the portion to be recovered from rate payers and the portion to be born by the shareholders. Such an examination should have taken place and its results included in the record and Final Order. Based on the lack of such findings, the TRA's decision to only include one half of the cost of the rate case in the rate was arbitrary. Accordingly, we reverse the Commission of the TRA on this issue and award TAWC the full amount of its proposed rate case expenses.

Finally, the TAWC contends that the TRA'S decision to cap UfW at 15% was an abuse of discretion and unsupported by material and substantial evidence. The Company takes the position that the TRA has historically taken into consideration all of TAWC's costs for fuel, power, and chemicals in determining TAWC's forecasted expenses. The Company explained that these costs directly relate to the treatment and pumping of all water in the distribution system whether it is water delivered and billed to customers or UfW. The Company states on appeal that TRA "has historically allowed TAWC to recoup the full costs of treating and providing all of its water regardless of the volume of UfW in the system." TAWC claims that TRA "broke" from this historical policy in its final order when it capped the percentage of UfW it could include in the forecast for fuel, power and chemical costs to 15%. The Final Order states that "[r]ecognizing the importance of conserving water, which is one of the state's most valuable natural resources, the panel established a baseline

efficiency standard. Based on the evidence presented, the panel limited the unaccounted-for-water percentage to fifteen percent." TAWC contends that the TRA could not have based this decision on the evidence as it clearly showed that TAWC's attrition year UfW would be 19.97% and that this level is reasonable based on the age of the water system and its geographical location in a mountainous area.

First, as to the historical precedent argument made by TAWC, while the TRA may not have ever set a 15% standard for UfW in a rate case brought by TAWC, it has recently imposed such a standard in other rate cases involving other TRA regulated water utilities. The Authority points to the 2006 rate case *In re Aqua Utilities Co*., TRA Docket No. 06-00187. In that case, while establishing a standard UfW percentage for ratemaking purposes, the panel said:

> Generally, the Authority finds a ten percent (10%) unaccounted-for-water level, as recommended by the American Water Works Association, is the proper percentage for purposes of setting rates, *absent good cause shown.* (Emphasis provided).

The TRA found that Aqua Utilities had shown good cause to increase the standard UfW percentage in that case to 15%. TRA claims that its decision in *Aqua* "pioneered" the Authority's policy concerning UfW and the reasonableness of utilizing a 15 % UfW standard was likewise included in a later settlement agreement between the parties in a rate case filed by Hickory Star Water Co., and approved by the TRA on December 30, 2008.[5]

The record demonstrates there was material and substantial evidence presented to the TRA regarding the use of the 15% standard. The president of TAWC , Mr. Martin, agreed that the 15% standard is used internally at TAWC and that it is a "good industry average." The TRA's use of the 15% UfW standard was based on material and substantial evidence and was not arbitrary. We affirm the TRA's order as to UfW.

In conclusion, we affirm the ruling of the TRA's except for its ruling excluding one-half of the expenses TAWC sought to recover as rate case expenses.

In our discretion we assess 80% of the costs of the appeal to Tennessee American Water Company, and 20% of the expenses on appeal to the Tennessee Regulatory Authority.

_____

[5] *See In re Aqua Utilities Co.,* TRA Docket No. 06-00187, *Final Order*, 2007 WL 4812199 at *5 (Tenn. Reg. Auth. Nov. 27, 2007); *In re Petition of Hickory Star Water Co. LLC for Approval of Adjustment of its Rates and Charges,* TRA Docket No. 08-00051, *Order Approving Settlement Agreement*, Ex. A, Proposed Settlement Agreement (Dec. 30, 2008).

HERSCHEL PICKENS FRANKS, P.J.