CF INDUSTRIES, Appellee,

v.

TENNESSEE PUBLIC SERVICE
COMMISSION et al., Appellants.

Supreme Court of Tennessee.

May 19, 1980.

Eugene W. Ward, Gen. Counsel, Mack H. Cherry, Asst. Gen. Counsel, for appellant Public Service Commission.

Eugene N. Collins, City Atty., Gary D. Lander, Sp. Counsel, Chattanooga, for City of Chattanooga.

Jack M. Irion, Bomar, Shofner, Bomar & Irion, Shelbyville, W. D. Spears, Spears, Moore, Rebman & Williams, W. L. Taylor, Jr., Chattanooga, for Chattanooga Gas Co.

James Clarence Evans, Nashville, Anthony E. Cascino, Jr., Longrove, Ill., for appellee.

## OPINION

HENRY, Justice.

This is a utility rate case.

### I.

A. *Pleadings and Proceedings before the Public Service Commission*

On May 31, 1977, Chattanooga Gas Company, a division of Jupiter Industries, filed its application before the Tennessee Public Service Commission seeking to place into effect a revised natural gas tariff and to amend a special contract with CF Industries, Inc. Chattanooga Gas is a natural gas distribution company serving franchises in Chattanooga, Cleveland and environs in Hamilton and Bradley County. CFI is its largest consumer, using approximately 30% of the petitioner's total gas supply.

The proposed rate increase applied to large industrial and commercial customers but did not affect small commercial users nor residential customers. The basic

premise of the application is that a declining gas supply has prohibited the pursuit of practices designed to increase sales volumes to offset heavy increases in operational costs, resulting in an inadequate rate of return. Thus, Chattanooga Gas urges upon the Commission a need to redesign its rates.

It is the theory and philosophy of Chattanooga Gas that there has been a regulatory shift from the traditionally accepted criteria for valuing utility service from "cost of service" to an "intrinsic value" rationale and that this operates to protect residential consumers from absorbing more than their fair share of rates. Chattanooga Gas insists that volume discounts resulting in price advantages to industrial users tend to encourage over-consumption at a time when conservation is a national priority.

CF Industries protested the petition, taking the position that it is the largest customer of Chattanooga Gas, using the gas as a raw product ingredient in the production of fertilizer, and that this unique use justifies a separate rate classification and a continuation of its contract with Chattanooga Gas.[1] Its unique use can best be summarized by noting that it is the only customer of Chattanooga Gas which utilizes gas as a raw material; all others use it only as a fuel. CFI can use no other fuel because of the design of its nitrogen complex. It is CFI's further position that its proposed share of the rate increase is disproportionate and discriminatory. CFI insists on the cost of service vis-a-vis the intrinsic value approach.

The Town of Lookout Mountain, Tennessee, intervened in opposition to the increase. The City of Chattanooga intervened for the purpose of preserving its contracts with Chattanooga Gas and protecting the interests of its citizens and rate payers.

To put the entire controversy into focus, we point out that essentially the contending parties are the Chattanooga Gas Company and CF Industries. Under the scheme proposed by Chattanooga Gas the Commission was asked to approve a two-step approach. First, the special rate to CFI would be eliminated and the Gas Company's industrial rate schedule would be made applicable to CFI. Secondly, a general rate increase would be applied to all industrial users, including CFI. The first step would increase CFI's rates by approximately $562,867 annually; the general rate increase would add approximately $157,133. The result would be a total increase of approximately $720,000, with CFI assuming the same proportionate burden as all other industrial consumers.

### B. Findings and Order of the Commission

On November 30, 1977, the Public Service Commission entered its findings and order. The Commission approved the increase in net operating income in the amount of $910,226. It ordered that CFI be charged at its "existing I–1 rate tariff," with the result that approximately $394,866 or 43.4% of the total increase was assessed against CFI with approximately 56.6% being assessed against the remaining 742 industrial consumers. The 25,000 residential users were not affected. The result was that other industrial users were raised and CFI continued to pay at a lower rate. After discussing the testimony relating to the cost of service versus intrinsic value approach, the Commission noted that "CFI is receiving gas at bargain prices under the special contract at a time when natural gas is a scarce commodity."

The Commission treated "cost of service" as "one of many approaches" but held that it was "not bound to a strict cost of service approach in designing rate schedules." The Commission summarized its holding:

Rate-making is an extremely complex process which involves much more than inputting cost figures into a computer and waiting for the results of the machine's mathematical functions. We

---

1. CF Industries relies heavily on the terms of a contract entered into July 6, 1966, between Chattanooga Gas and its predecessor, Farmer's Chemical Association. This contract was assigned to CFI on May 20, 1976.

must consider all aspects surrounding the determination of just and reasonable rates. In our opinion, a strict cost of service approach is not at this time of decreasing energy supplies the best approach to setting rates. . . . We, therefore, order the company to change the existing rates charged to CF Industries for firm gas to the existing I–1 rate tariff.

The Commission pointed out that "CFI will still be able to purchase gas at a lower effective rate than other industrial customers due to its high load factor." Further the Commission specificized this finding by noting that "on average the industrial customers other than CF Industries are paying $1.46 per McF under existing rates, while CFI will pay $1.35 per McF under the same rate schedule."

It should be noted that while under the Commission's holding CFI's rate was increased to that being paid by other industrial users at the time the petition was filed, it was not subjected to the general rate increase with the result that it continues to pay at a lower rate than all others in the same class.

### C.  Action of the Chancery Court

Pursuant to a petition for judicial review, the Chancery Court of Davidson County affirmed the Public Service Commission. Citing *Allied Chemical Corp. v. Georgia Power Co.*, 236 Ga. 598, 224 S.E.2d 396 (1976), the Court held that the failure of the Commission to follow a cost of service approach "does not make its decision unjust and discriminatory." Further citing the requirement of Section 65–518, T.C.A., that the Commission modify any rates found to be "unjust, unreasonable, excessive, insufficient, or unjustly discriminatory or preferential," the Chancellor noted that CFI "had been obtaining gas at special contract rates lower than other industrial users." The Court held that the Commission's findings were supported by substantial and material evidence.

### D.  Action of the Court of Appeals

The Court of Appeals for the Middle Section reversed, disagreeing with the Commission and the Chancellor in every material particular. The Court held that (1) the Commission violated Section 4–519, T.C.A., by failing to make findings of fact; (2) that the Commission failed to require and consider cost of service data; (3) that with a general cost of service study there is a reasonable probability that the result would have been different; and (4) that there was no substantial evidence to support the action of the Commission and its action was "discriminatory" and "patently arbitrary."

The thrust of the opinion of the Court of Appeals is that the Commission increased rates to large commercial and industrial users to the exclusion of smaller commercial and residential users "without any evidence to justify the discrimination." The matter was remanded to the Public Service Commission for a "redetermination of rates of the customers of Chattanooga Gas Company," to include small commercial and residential users.

We sustain the Public Service Commission and the Chancellor and reverse the Court of Appeals.

### II.

### Standard of Review

Section 4–5–117, T.C.A., covers judicial review under the Uniform Administrative Procedures Act. Sub-section (g) provides that review shall be "confined to the record." Sub-section (h) restricts reversal or modification of the agency's decision to those cases where the decision violates constitutional or statutory provisions, or is in excess of the statutory authority of the agency, or is made upon unlawful procedure, and to those instances where the decision is

arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

unsupported by evidence which is both substantial and material in the light of the entire record.

Further narrowing and restricting the review in the Chancery Court is the statutory command:

> In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court *shall not substitute its judgment for that of the agency* as to the weight of the evidence on questions of fact. (Emphasis supplied). Section 4–5–117(h)(5), T.C.A.

Thus the UAPA requires that the trial court review factual issues upon a standard of substantial and material evidence. But this is not a broad, *de novo* review. It is restricted to the record and the agency finding may not be reversed or modified unless arbitrary or capricious or characterized by an abuse, or clearly unwarranted exercise, of discretion and must stand if supported by substantial and material evidence.

The same standard of review prevails on the appellate level. We cannot, as a general rule, "afford any broader or more comprehensive review to cases arising under the Act than is afforded to them by the trial court in the first instance . . . ." *Humana of Tenn. v. Tenn. Health Facilities Com'n*, 551 S.W.2d 664, 668 (Tenn.1977). Further a concurrent finding between the agency and the trial court on any issue of fact is conclusive upon this Court. This Court so held in *Blue Ridge Transportation Co. v. Hammer*, 203 Tenn. 398, 313 S.W.2d 433 (1958):

> Unless there is a plain abuse of discretion by the Commission, its orders will not be disturbed on appeal. And more especially where the Chancellor has considered the record on the common-law writ of certiorari and affirmed the order of the Commission, we feel that this *concurrent finding is conclusive of the issue.* (Emphasis supplied). 203 Tenn. at 404, 313 S.W.2d at 436.

The Uniform Administrative Procedures Act, to the extent of the standard of review, did not make significant changes in prior decisions and statutory law. In view of the fact that the functions of the Commission are solely administrative or legislative as distinguished from judicial, this Court has consistently held that the review is for the "very limited purpose of determining whether the Commission has acted arbitrarily, or in excess of jurisdiction, or otherwise unlawfully." *City of Whitwell v. Fowler*, 208 Tenn. 80, 83, 343 S.W.2d 897, 899 (1961).[2] This, of course, would require that it be supported by substantial and material evidence.

Moreover, under Section 65–520, T.C.A., the power to determine whether rates are "just and reasonable" is reposed in the Commission. There is a presumption that the rates so established are correct and any party who attacks the Commission's findings has the burden of proving that they are illegal or unjust and unreasonable. *Southern Bell T. & T. Co. v. Tenn. Pub. Serv. Com'n*, 202 Tenn. 465, 304 S.W.2d 640 (1957).

Consideration must also be given to the statutory recognition of the "agency's experience, technical competence, and specialized knowledge." Section 4–5–109(7), T.C.A. *See also, Blue Ridge Transportation Co. v. Hammer, supra*; Section 65–209, T.C.A.

When the evidence is considered "in light of the entire record," Section 4–5–117(h)(5), T.C.A., and in accordance with the established statutory and decisional law, we find and hold that the Commission's action was supported by ample material and substantial evidence. We have neither the disposition nor the power to substitute our judgment for that of the Commission as to the weight of the evidence on any factual issue. This leaves only questions of law for our determination.

## III.

### *The Sufficiency of the Commission's Finding of Fact*

The UAPA provides that:

---

**2.** *See also, Hoover Motor Exp. Co. v. Railroad & Public Util. Com'n*, 195 Tenn. 593, 261 S.W.2d 233 (1953), for complete discussion of the legislative character of the Public Service Commission.

A final decision shall include findings of fact, conclusions of law, and reasons for the ultimate decision. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. Section 4–5–113, T.C.A.

█ This is a statutory imperative; it "is not a mere technicality but is an absolute necessity without which judicial review would be impossible." *Levy v. State Bd. of Examiners, Etc.*, 553 S.W.2d 909, 911 (Tenn. 1977).

Able counsel representing CFI earnestly urges that the Commission's order was fatally defective. The Court of Appeals held that the Commission's order "fails to disclose any finding of fact supporting the apparent discrimination against the appellant." The Chancellor, on the other hand, correctly noted that "[t]he purpose of findings and conclusions is to aid the court in determining the reasons behind the agency decision, and whether the agency's conclusion is based on sufficient evidence," and held that "the order . . . reflects findings of fact and conclusions of law which are sufficient to enable this court to review the decision."

█ The sufficiency of an agency's findings of fact must be measured against the nature of the controversy and the intensity of the factual dispute. It is obvious that where there is no disputed issue of fact and the sole question before the agency is the proper conclusion to be drawn from the undisputed facts and the application of the correct legal rules, the record need not be burdened with detailed findings of fact. In such a case the facts need only be recited.

█ At the other end of the spectrum are those cases wherein the issues of fact are sharply contested and the proof is conflicting. There a detailed finding of fact dovetailed to the record is a practical and legal imperative. Thus, the nature of the finding necessarily varies from case to case.

The Commission had before it in this case other significant issues which normally carry through to the chancery and appellate review, but which are no longer at issue. Among these was the basic rate increase, an issue separate and apart from rate design. In reaching a decision on this threshold question the Commission was required to consider the rate base, revenues and expenses of the utility, and the significant matter of a fair rate of return based on the petitioner's long term, debt, common equity, and other underlying considerations. These are issues that normally provoke controversy and prompt appeals, and on them the Commission made detailed findings of fact.

We have examined CFI's 15-point proposed finding of fact filed with the Commission. The first two suggest that the Commission find that CFI is the largest customer of Chattanooga Gas using approximately 30% of the total gas supply. There was no dispute as to this and its inclusion in the finding would have served no useful purpose.

█ The third proposal related to the uniqueness of the use CFI makes of the gas, a fact that we find to have no material bearing on any issue. Number 4 sets out that the rate originally approved by the Commission was based on a cost of service presentation and was fair and reasonable. Number 5 relates to the original gross profit increases and would have the Commission hold that in the absence of a cost of service study, it cannot ascertain gross profits or the trend thereof in relation to other classes of customers. The original rate has no controlling significance and cost of service is not an exclusive method of determining rate design.

The proposed sixth finding sets forth the reasons Chattanooga Gas has not found it necessary to request a rate increase since 1959. This is argumentative and not of controlling significance. The proposed seventh finding merely relates to an amendment to the pleadings.

The eighth proposal basically relates to an item not allowed by the Commission. The ninth, tenth and eleventh proposals deal with the results of the requested in-

crease. Some of the figures are admittedly incorrect. These three proposals relate basically to discriminatory aspects of the rate design and are argumentative in nature. All concerned knew the end results; there was no basic dispute and its inclusion in the finding would have served no useful purpose.

The twelfth proposal was that Chattanooga Gas had used the intrinsic value approach and the thirteenth asserted a general practice to include a cost of service approach. This is the crux of this controversy and the Commission made full conclusions in this regard. The fourteenth proposal merely argues CFI's insistence that a full cost of service study would substantially decrease its share of any increase. The last proposal urges hardship on farmers and on CFI and is not sufficiently documented to form a basis for a finding.

In summary, the proposed findings incorporate agreed facts, background information, results and argument. Pertinent and essential to this issue are only those relating to cost of service data *vis-a-vis* intrinsic value. These call for conclusions of law and, as to them, the findings and conclusions contain full discussion.

The primary difficulty in proposing and making findings of fact in this case is that there were no disputed facts pertinent to the issue. Essentially, this controversy raises a single issue, a question of law, *viz.*: May the Public Service Commission adopt a rate design without having before it for consideration a cost of service study?[3] A secondary issue relates to a charge of discrimination against CFI.

■ We hold, in the context of this case, that the Commission's finding was adequate and proceed to discuss the controlling questions of law.

## IV.

*Cost of Service versus Intrinsic Value*

■ The polestar of public utility rate establishment and regulation is the "just and reasonable" requirement of Section 65–518, T.C.A. There is no statutory nor decisional law that specifies any particular approach that must be followed by the Commission. Fundamentally, the establishment of just and reasonable rates is a value judgment to be made by the Commission in the exercise of its sound regulatory judgment and discretion.

Specifically, there is no requirement in any rate case that the Commission receive and consider cost of service data, or that such data, if in the record, are to be accorded exclusivity. It is self-evident that cost of service is of great significance in the establishment of rates but is of lesser value in arriving at rate design. A fair rate of return to the regulated utility is one thing; the establishment of rates among various customer classes is quite another.

Moreover, the intrinsic value of the service rendered, while not controlling, is a proper element of consideration and is, perhaps, of more value in establishing rates among customers than in determining a fair rate of return to the utility itself.

The criteria by which the Commission should be guided have received only generalized comments in our reported decisions. This is proper because the courts are playing a limited role in reviewing actions which essentially are legislative in character. Rate making is not a judicial function and we accord the Commission great deference in reviewing its decisions. On fixing rates in general the Court has spoken in terms of what is just and reasonable "under the proven circumstances," of "regard to all relevant facts" and to a rate "in the zone of reasonableness." *Southern Bell Telephone & Telegraph Co. v. Tennessee Public Service Com'n.*, 202 Tenn. 465, 304 S.W.2d 640 (1957).

The Uniform Administrative Procedures Act authorizes the agency to take notice of "generally recognized technical and scien-

---

**3.** Counsel for CFI made it clear in beginning colloquy that the controversy was "basically in the area of allocation of cost of service to different customers, and the rate structure as to *who is going to bear the burden.*"

tific facts within the agency's specialized knowledge," and in the evaluation of evidence the agency is specifically authorized to utilize its "experience, technical competence, and specialized knowledge." Section 4–5–1097, T.C.A.

Thus, the Public Service Commission in rate making and design cases is not solely governed by the proof although, of course, there must be an adequate evidentiary predicate. The Commission, however, is not hamstrung by the naked record. It may consider all relevant circumstances shown by the record, all recognized technical and scientific facts pertinent to the issue under consideration and may superimpose upon the entire transaction its own expertise, technical competence and specialized knowledge. Thus focusing upon the issues, the Commission decides that which is just and reasonable. This is the litmus test— nothing more, nothing less.

In *United Inter-Mountain Telephone Co. v. Public Service Com'n*, 555 S.W.2d 389 (Tenn.1977), this Court noted that "[t]he impact of the Administrative Procedures Act on the review of the decisions made by state boards, commissions and agencies, including the Public Service Commission, is *massive*" (emphasis supplied), and pointed out that "[i]t casts upon the Commission the heavy burden of a sound, reasoned, and judicious approach in the exercise of its jurisdiction." 555 S.W.2d at 392.

We reiterate that neither the legislature nor the courts have established any precise formula or yardstick to guide the Commission. As pointed out by the Georgia Supreme Court in *Allied Chemical Corp. v. Georgia Power Co.*, 224 S.E.2d 396 (Ga. 1976):

> The process of setting rates is not required to follow any particular course, so long as the end result does not violate the "just and reasonable requirement" requirement . . . . 224 S.E.2d at 399.

The Oklahoma Supreme Court, in *Application of Arkansas Louisiana Gas Co.*, 558 P.2d 376 (Okl.1976), pointed out:

> Commission is not bound by a single formula or a combination of formulas in fixing rates and none is exclusive or more favored than the others. (citation omitted) There is no precise statutory or court announced basis for determining the justness or reasonableness of class rate level structures or relationships, the Court generally holding that rate making is the responsibility of a regulatory commission effectively exercising its discretion upon sufficient evidence before it. 558 P.2d at 379.

Finally, we adopt the concise and correct conclusions of the Minnesota Supreme Court in *St. Paul Area Chamber of Commerce v. Minnesota Public Service Com'n.*, 312 Minn. 250, 251 N.W.2d 350 (1977):

> [W]e must presume that the members of the commission itself, with their supporting staff, have in their grasp practical knowledge in the field of utilities regulation not possessed by either the courts or laymen in general.

\* \* \* \* \* \*

> The commission, in order to carry out its mandate from the legislature to establish "just and reasonable" rates, must be able to draw on its own internal sources of knowledge and experience. As with the legislature itself, we assume that it does so in each instance and that we ought not to interfere unless it should clearly exceed its statutory powers. 251 N.W.2d at 354.

We cannot say on this record that the Commission exceeded its regulatory judgment and discretion in acting without a cost of service study in a rate design case. The imposition of this requirement would be an unwarranted intrusion into the rate making process.

The record shows that the Commission reached a result that was just and reasonable and equitable.

## V.

### Discriminatory Rate Structure

CFI contends that the Commission acted discriminatorily and without any rational basis in imposing a rate increase on "743

large users to the exclusion of the 25,000 smaller users" without any evidence to justify the discrimination." The Court of Appeals so held.

We should point out at the onset that 742 of the 743 large users have voiced no complaint.

The following tabulation is significant:

| | Net Increase | % Increase | Consumption | Generated Gross Profit |
|---|---|---|---|---|
| CFI | $394,866 | 43.4 | 34.1% | 15.7% |
| 742 others | 515,360 | 56.6 | 56.6 | 65.2 |
| 25,000 residential | -0- | -0- | 9.3 | 19.1 |

Thus, it will be seen that while CFI buys approximately one-third of the total output of Chattanooga Gas, it accounts for only 15.7% of the profit. It uses almost four times as much as the 25,000 residential customers but contributes less to gross profit. The 742 other industrial users consume 22.5% more gas than CFI, but contribute 49.5% more to the gross profit.

Additionally, as found by the Commission, CFI pays $1.35 per McF, while the 742 other industrial users pay $1.46, and is "receiving gas at bargain rates."

But this is not the discrimination that CFI has in mind. Its insistence and that of the Court of Appeals was that exempting the 25,000 residential customers from the increases was discriminatory. It was apparently the view of the Court of Appeals that when the rates charged one class of customers are raised, all others must also be raised. This does not necessarily follow.

■ There was no pleading or procedural predicate in this case which would have justified a revision of residential rates. Remanding this case to the Commission to adjust the rates of residential customers is beyond the purview of judicial review. The sole concern of the courts, at each stage of appellate review, is to determine whether the Commission's action on the matters raised by the application meets the requirements of the law. Rate making is not a judicial function and the courts are powerless to remand for the determination of a new cause of action.

■ If the Commission's action was invalid in that the rate design approved was discriminatory and without rational basis, the only appellate remedy is to strike the increase, in whole or in part, or remand for reconsideration of the respective rights of the contending parties.

The fact that residential consumers pay at a lesser rate is of no patent significance. Utilities traditionally have charged differing rates among classes of customers. Many factors enter into the determination of rates among classes of consumers. This record is silent in this regard and we will not assume from a silent record that there is no material basis for the differing rates.

■ Section 65–518, T.C.A., gives the Public Service Commission the express power to adjust rates that are "unjust, unreasonable, excessive, insufficient or unjustly discriminatory or preferential." Again, we are not willing to assume from an incomplete record that the Commission deviated from its sworn duty; to the contrary, we presume its compliance. We are unwilling to hold, in the posture of this case, that the Commission established unjustly discriminatory or preferential rates.

■ While we hold, without hesitation or equivocation, that a public utility may impose differing rates among customer classes, we do not deem it necessary or proper to explore or delineate the criteria that must be met.

We are content to rest our holding on the lack of pleading and procedural predicate for a consideration of the issue involving the residential customers. The discrimination involving the remaining industrial users may be more apparent than real. In any event, their situation is not presented for review.

The judgment of the Court of Appeals is reversed; the Trial Court and the Public Service Commission are affirmed.

BROCK, C. J., FONES and HARBISON, JJ., and BLACKBURN, Special Justice, concur.