IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 24, 2017 Session

## B&W PIPELINE, LLC v.
## TENNESSEE REGULATORY AUTHORITY ET AL.

**Appeal from the Tennessee Regulatory Authority**
**No. 15-00042**

_____

**No. M2016-02013-COA-R12-CV**

_____

B&W Pipeline, LLC ("B&W"), a public utility that owns a gas pipeline in three Tennessee counties, filed a petition with the Tennessee Regulatory Authority[1] ("the Authority") seeking a rate increase. As part of the rate increase request, B&W sought to include in the rate base $2.6 million in acquisition costs that it had incurred when it purchased the pipeline and several oil and gas wells in 2010. A contested case hearing took place on September 14, 2015. Following deliberation, the Authority denied B&W's proposed acquisition adjustment and instead utilized a 2008 federal income tax return filed by the pipeline's previous owner to establish the pipeline's value for the purpose of determining the rate base. The Authority issued its final order on March 10, 2016. B&W timely filed a motion for reconsideration. The Authority denied the motion for reconsideration with respect to the value of the pipeline while granting the motion for reconsideration with respect to certain due diligence and other costs B&W incurred in the acquisition. After the submission of briefs, the Authority affirmed its decision to exclude the additional acquisition costs. The Authority issued a final order concerning reconsideration on August 4, 2016. B&W filed a timely petition for review with this Court on October 3, 2016. Discerning no error, we affirm the Authority's decision.

**Tenn. R. App. P. 12 Direct Review of Administrative Proceeding; Judgment of the Tennessee Regulatory Authority Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

_____

[1] Effective April 4, 2017, the Tennessee Regulatory Authority was renamed the Tennessee Public Service Commission. *See* 2017 Tenn. Pub. Acts Ch. 94 (S.B. 747). Because this name change occurred during the pendency of this appeal and after submission of the appellant's initial brief, we will continue to utilize the moniker, Tennessee Regulatory Authority, for purposes of this appeal.

Patricia Head Moskal and Henry M. Walker, Nashville, Tennessee, for the appellant, B&W Pipeline, LLC.

Kelly Cashman-Grams and Ryan McGehee, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; Vance L. Broemel, Senior Counsel; and Daniel P. Whitaker, III, Assistant Attorney General, for the appellee, the Consumer Protection and Advocate Division Office of the Tennessee Attorney General.

**OPINION**

### I.    Factual and Procedural Background

B&W is a public utility that owns a natural gas pipeline located in parts of Pickett, Morgan, and Fentress counties in Tennessee. The pipeline was originally built in the 1980s. The pipeline has one primary customer for regulated service, Navitas TN NG LLC ("Navitas"). B&W delivers natural gas to Navitas, which, in turn, distributes gas to a number of residential and commercial customers in Tennessee and Kentucky.

Prior to 2010, the pipeline and the distribution system were both owned and operated by Gasco Distribution Systems, Inc. ("Gasco"). As part of Gasco, the pipeline operated pursuant to Gasco's certificate of convenience and necessity ("CCN"), granted by the Authority. In 2010, Gasco, while in bankruptcy, sold the local distribution system to Navitas, and Gasco's CCN was transferred to Navitas. Gasco subsequently sold the pipeline and ninety-six oil and gas wells to Highland Rim Energy, B&W's parent company, for $2,633,085.00. The pipeline and wells were later assigned to B&W. B&W presented testimony that the pipeline and wells, many of which were inactive, were a "package deal," such that B&W was "stuck with the wells."

Following its purchase of the pipeline, B&W continued providing gas to Navitas at the rate of $.60 per Mcf,[2] according to a pre-existing contract. A representative for B&W testified that two to three years following the purchase of the pipeline, the Authority informed B&W that the pipeline had to be regulated. The Authority granted B&W a CCN on January 8, 2015. B&W filed a petition to increase rates with the Authority on April 2, 2015, following expiration of the aforementioned contract. B&W sought to increase its rates from $.60 per Mcf to $3.69 per Mcf, representing a significant rate increase. Both Navitas and the Consumer Protection and Advocate Division of the Office of the Tennessee Attorney General ("Consumer Advocate") were allowed to

---

[2] This is the abbreviation for one thousand cubic feet of natural gas.

intervene and oppose the rate increase, and the Authority opened a contested case proceeding.

In its petition, B&W combined the purchase price of the pipeline and gas and oil wells, as well as certain acquisition costs, such as due diligence costs, into the proposed rate base. B&W argued that it should be allowed to charge a rate that covered its expenses, including depreciation, and that allowed B&W to earn a reasonable rate of return on its investment in physical assets. The parties engaged in discovery prior to the hearing, which was scheduled for September 2015. During discovery, B&W stated that it had no records from the prior owner disclosing the original cost of the pipeline.

On August 11, 2015, the Consumer Advocate and Navitas submitted pre-filed testimony in opposition to the proposed rate increase, including the proposed value of the pipeline for rate-making purposes. The Consumer Advocate's witness, Ralph Smith, asserted that the rate base should not include the acquisition costs of the pipeline in 2010 but that it should include only the original pipeline cost minus depreciation pursuant to the Uniform System of Accounts, which the Authority required B&W to utilize. B&W submitted pre-filed rebuttal testimony, wherein B&W's witness, William Novak, contended that the investment made in purchasing the pipeline and wells, totaling over $2.6 million, should be included in the rate base as a reasonable "estimate" of the original cost of the pipeline.[3] In response to a request from the Authority seeking additional information concerning the value of the pipeline, on September 8, 2015, Navitas submitted a 2008 federal income tax return filed by Gasco.

The contested case hearing took place before the Authority on September 14, 2015. During the hearing, the Consumer Advocate submitted the 2008 Gasco tax return as evidence with no objection from B&W. Mr. Smith, on behalf of the Consumer Advocate, testified that the 2008 Gasco tax return was the most reliable information regarding the pipeline's depreciated original cost. This tax return listed depreciable assets of $854,826.00 and reported depreciation for that year in the amount of $22,564.00. Mr. Smith opined that the pipeline had thus been almost fully depreciated by the time of the hearing. Mr. Novak opined that tax return information relied upon by Mr. Smith was actually referring to the oil and gas wells rather than the pipeline. At the conclusion of the hearing, B&W's counsel acknowledged that "no clear evidence of what the rate base ought to be" existed and that the issue was one of "policy and fairness."

On November 16, 2015, the hearing officer issued an order indicating that the parties had informed him that they "d[id] not seek additional argument, evidence, or new cross-examination of any evidence." No new evidence was thereafter filed by either party. On December 14, 2015, the Authority deliberated and set rates. As part of its

---

[3] Both Mr. Smith and Mr. Novak are certified public accountants.

3

ruling, the Authority rejected B&W's position that the 2010 purchase price of $2.6 million for the pipeline and wells should be included in the rate base. Instead, the Authority utilized the 2008 Gasco tax return, determining it to be the "most sound support for the prior owner's original cost and the value of the pipeline at the time of acquisition." Based on the information contained in the tax return, the Authority concluded that the original cost of the pipeline had been almost fully depreciated by the time of the 2015 rate hearing.

Following issuance of the Authority's order setting rates, B&W filed a timely motion for reconsideration. In this motion, B&W claimed that assigning a value of $1.2 million to $1.6 million to the pipeline would equitably balance the interests of the parties. B&W attached new documents, including a non-notarized affidavit of a prior president of Gasco and additional Gasco tax documentation, for the Authority to consider as additional evidence with respect to the value of the pipeline. B&W also argued in the motion that the Authority had erred by failing to include related acquisition costs of $225,585.31 in the rate base calculation.

In an order dated May 16, 2016, the Authority declined to grant reconsideration with respect to the value of the pipeline, determining that the issue had been fully litigated during the hearing on the merits and that no good cause was presented to justify B&W's failure to introduce the additional evidence during the original proceeding. The Authority did, however, grant reconsideration regarding the issue of acquisition costs, directing the hearing officer to schedule arguments addressing this issue. Subsequently, on August 4, 2016, the Authority denied the inclusion of such acquisition costs in the rate base, determining that such costs had been included in the $2.6 million dollar purchase price previously rejected by the Authority. B&W filed a timely petition for review with this Court.

## II.    Issues Presented

B&W presents the following issues for our review, which we have restated slightly:

1.    Whether the Authority acted in an arbitrary and capricious fashion when it refused to include in the rate base the acquisition price paid for the pipeline by B&W in 2010.

2.    Whether the Authority abused its discretion by denying B&W's petition for reconsideration with respect to the value of the pipeline.

3.    Whether the Authority's final order fails to comply with the requirements of Tennessee Code Annotated § 4-5-314(c) because it

4

contains no findings of fact or conclusions of law with regard to the acquisition costs.

## III. Standard of Review

This Court's review of the Authority's decision is governed by Tennessee Code Annotated § 4-5-322(h) (Supp. 2017). *See Consumer Advocate Div. ex rel. Tenn. Consumers v. Tenn. Regulatory Auth.*, No. M1999-01170-COA-R12-CV, 2001 WL 575570, at *3 (Tenn. Ct. App. May 30, 2001). Tennessee Code Annotated § 4-5-322(h) provides:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
>
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The review by this Court is for the "very limited purpose of determining whether the [Authority] has acted arbitrarily, or in excess of its jurisdiction, or otherwise unlawfully." *Consumer Advocate & Prot. Div. of Office of Atty. Gen. v. Tenn. Regulatory Auth.*, No. M2011-00028-COA-R12-CV, 2012 WL 1964593, at *13 (Tenn. Ct. App. May 30, 2012) (quoting *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980)) (in turn quoting *City of Whitwell v. Fowler*, 343 S.W.2d 897, 899

5

(Tenn. 1961)).  Such issues are reviewed *de novo* based upon the Authority's record.  *See Consumer Advocate & Prot. Div. of Office of Atty. Gen.*, 2012 WL 1964593, at \*13.  As this Court has further explained:

> [I]n reviewing an administrative decision, a court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."   T.C.A. § 4-5-322(h)(5); *Humana of Tennessee v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664 (Tenn. 1977). Factual issues are reviewed upon a standard of substantial and material evidence, and not upon a broad, *de novo* review.  *Southern Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984) (citing *CF Indus. v. Tennessee Pub. Serv. Comm'n,* 599 S.W.2d 536, 540 (Tenn. 1980)). Substantial and material evidence is "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Sweet v. State Tech. Inst. at Memphis,* 617 S.W.2d 158, 161 (Tenn. App. 1981) (quoting *Pace v. Garbage Disposal Dist. of Washington County,* 54 Tenn. App. 263, 390 S.W.2d 461, 463 (1965)).  It is "something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 280 (Tenn. App. 1988).  A court will not disturb a reasonable decision of an agency with expertise, experience, and knowledge in the appropriate field.  *Southern Ry. Co.,* 682 S.W.2d at 199.

*In re All Assessments*, No. 01A01-9812-BC-00642, 1999 WL 632824, at \*4 (Tenn. Ct. App. Aug. 20, 1999).

IV.  Fixing Just and Reasonable Rates:  Original Cost versus Acquisition Cost

The Authority "has the power . . . to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof . . . ."  Tenn. Code Ann. § 65-5-101(a) (2015).  Additionally, Tennessee Code Annotated § 65-5-103 (2015) states in pertinent part:

(a) When any public utility shall increase any existing individual rates, joint rates, tolls, fares, charges, or schedules thereof, or change or alter any existing classification, the authority shall have power either upon written complaint, or upon its own initiative, to hear and determine whether the increase, change or alteration is just and reasonable.  The burden of proof to show that the increase, change, or alteration is just and reasonable shall be upon the public utility making the same.  In determining whether such

6

increase, change or alteration is just and reasonable, the authority shall take into account the safety, adequacy and efficiency or lack thereof of the service or services furnished by the public utility.

With regard to utility rates, this Court has previously explained:

The utility is permitted to set base rates that allow it to recover its operating expenses and earn a profit from the consumer from the operation of its business; in overseeing these base rates, the TRA is required to balance the interests of the utility with the interests of Tennessee consumers. *See Tenn. Am. Water Co. v. Tenn. Reg. Auth.,* No. M2009-00553-COA-R12-CV, 2011 WL 334678, at *15 (Tenn. Ct. App. Jan. 28, 2011). On one hand, the rate approved by the TRA must provide the utility the opportunity to earn a just and reasonable return on its investment; on the other hand the rate must not be exorbitant, so as to avoid the exploitation of consumers. *See Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of the State of West Va.,* 262 U.S. 679, 690, 43 S. Ct. 675, 67 L. Ed. 1176 (1923). "A rate need only fall within the 'zone of reasonableness' . . . that takes into consideration the interests of both the consumer and the utility." *Tenn. Cable Television Ass'n. v. Tenn. Pub. Serv. Comm'n,* 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992).

*Consumer Advocate & Prot. Div. of Office of Atty. Gen.*, 2012 WL 1964593, at *1.

In the instant action, the Authority in its order similarly explained the criteria utilized to set "just and reasonable rates" as follows:

In setting rates for public utilities, the Authority balances the interests of the utilities subject to its jurisdiction with the interests of Tennessee consumers, i.e., it is obligated to fix just and reasonable rates. The Authority must also approve rates that provide regulated utilities the opportunity to earn a just and reasonable return on their investments. The Authority considers petitions for a rate increase, filed pursuant to Tenn. Code Ann. § 65-5-[1]03, in light of the following criteria:

1.  The investment or rate base upon which the utility should be permitted to earn a fair rate of return;

2.  The proper level of revenues for the utility;

3.  The proper level of expenses for the utility; and

4.     The rate of return the utility should earn.

As the Authority also explained in its order, "[t]he primary contested issue concerning rate base centered on whether to allow the inclusion of B&W's acquisition cost of $2,633,085 in rate base calculations, as proposed by [B&W]." With regard to this issue, the Authority made the following extensive findings:

B&W acquired the pipeline and ninety-six (96) oil and natural gas wells for $2,633,085 from Gasco's bankruptcy proceeding in 2010. [B&W] had no records for the net book value of the pipeline, but rather recorded the acquisition price as plant in service. According to [B&W], because the seller would not sever the pipeline from the wells, B&W had to take the wells in order to get the pipeline; therefore B&W assigned none of the acquisition cost to the wells. B&W estimated the value of the producing wells to be $60,943 and the net liability of capping the inactive wells to be $29,845.

* * *

B&W believes it made a good business decision in purchasing the pipeline for $2.6 million because it is less than the cost to build one. Mr. Ramon further testified that [B&W] became aware after the purchase that approximately 40 to 50 of the wells had already been plugged or handed over to the landowners. Further, only thirteen (13) of the wells are currently producing oil or gas.

In addition, [B&W] supported its acquisition cost with an independent analysis performed by Bell Engineering. The Bell analysis estimates the 2013 replacement cost of the pipeline to be $12,885,858 and the undepreciated costs are $6,559,308, which far exceeds the acquisition cost included in rate base. Even if this amount is depreciated back to the pipeline's construction date, its replacement value still exceeds the amount included in rate base. . . .

Navitas noted that 100% of the purchase price is attributed in B&W's rate case to the pipeline although other assets, including wells, were included in the transaction. Mr. Hartline asserts that there is no sound economic basis for spending $2 million on a pipeline that earns $20,000 annually. Therefore, a substantial portion of the purchase price is and should be attributed to the other assets purchased in the transaction. Mr.

8

Hartline testified that the Bell Engineering report was an inappropriate basis to support inclusion of the acquisition costs as replacing the pipeline today would be uneconomic in the rural area the pipeline services.

In the pre-filed testimony of Mr. Smith, the Consumer Advocate proposed to exclude from Plant in Service the pipeline purchase costs and, instead, treat it as an Acquisition Adjustment because B&W failed to provide reliable information on the original cost of the pipeline. Mr. Smith explains that any amount paid for utility plant in excess of the utility's original costs are referred to as "Goodwill" or Acquisition Premium, and not allowed recovery in rates because it is not used or useful in the provision of utility service. Disallowance of Goodwill or Acquisition Premium discourages companies from marking up the cost of assets used to provide utility service through the transfer or selling to different owners. Mr. Smith states that B&W was unable to provide the original cost, and the pipeline cost was not available from the books of Gasco (the seller) or the property tax information on file for Gasco. He determined from the responses to data requests that B&W did acquire 96 oil and gas wells along with the pipeline and that B&W determined the net value of these wells to be a negative $29,845 due to the cost of capping inactive wells. Therefore, none of [the] purchase price was assigned by B&W to the wells.

From B&W's 2012 trial balance, Mr. Smith ascertained that there was a gross profit of $182,582, which included $19,729 for gas transportation and $162,853 from oil and gas sales and royalties. Thus, according to Mr. Smith, of the revenues generated by the pipeline, 11% were from transportation service and 89% from oil and gas sales and royalties. The wells in question have since been transferred to a B&W affiliate, Rugby Energy, LLC, and are operated by another affiliate, Enrema, which is the same affiliate charging B&W an annual operator fee. Because of the gross profit in 2012 and the transfer taking place between two affiliates with the same ownership, Mr. Smith questions the lack of compensation for the wells. For these reasons, the Consumer Advocate removed the acquisition amount of $2,597,285 from Plant in Service and left only the $437,715 as the cost of the pipeline. This represents the amount spent by B&W for safety improvements after B&W acquired the pipeline. Removing this amount from Plant in Service results in a reduction of the attrition year mid-point accumulated depreciation by $568,367 for a total rate base reduction of $2,028,918 related to the cost of the pipeline.

In response to data requests from Authority Staff, Navitas provided records from the previous owner of the pipeline, including a 2008 tax return. During the hearing, Mr. Smith addressed the 2008 federal income tax return, stating that the reported pipeline assets at the end of 2008 were $854,926 as plant-depreciable assets. The tax return reported accumulated depreciation of $703,017 as of December 31st, 2008 and a land asset reported in the amount of $68,538. The reported tax year depreciation was $22,564, which is representative of a depreciable life of approximately 38 to 40 years; reasonable for a gas pipeline. Mr. Smith points out the return was prepared by a CPA and signed by an officer of the Company and as such, appeared to be the most reasonable and reliable information available on the value of the pipeline.

With respect to Gasco's 2008 tax return, Mr. Novak responded that the affiliate IRS PBA code listed is for mineral extraction. Therefore the return is not really applicable in this case because it does not represent a value for the pipeline. Rather it represents a value for the oil and gas wells. Mr. Smith was cross-examined regarding the IRS PBA codes noted by Mr. Novak. Mr. Smith noted that Schedule L of the return lists these as depletable assets, and a pipeline or building should be classified as depreciable assets. Therefore, the tax return is applicable and if one carries the amount out through the midpoint of the attrition year, it would be almost zero ($17,182) as the Consumer Advocate proposed. Mr. Smith agrees that either zero or $17,182 would be an acceptable cost of the pipeline at the midpoint of the 2016 attrition year.

Mr. Novak asserts that the Consumer Advocate has ignored the data provided by [B&W] and the State of Tennessee's tax assessment of the pipeline when he disallows the acquisition cost of the pipeline in his analysis. The tax assessment relied upon by the Company reported to the State of Tennessee as the cost of the pipeline in exact and equal amounts in each county the pipeline operates within, which Mr. Smith questions. Mr. Smith points out that the previous owner had a total assessment of $756,000, with $976 assessed in Fentress County, $227,660 in Pickett County and the remainder in Campbell County, including Jellico. Mr. Smith notes that the tax assessment is prepared by the Company and requires information regarding B&W's last rate case. In sum, the Consumer Advocate contends that the tax assessment relied upon by the Company is an unreasonable basis to support the inclusion of the acquisition price in rate base.

* * *

There is no persuasive evidence that suggests that including the entire purchase price is in the public interest. Under the circumstances of this case, the most reasonable determination is based upon information that is related to the actual cost of the plant when it was constructed. Based on the evidence in the proceeding, the panel finds that including the pipeline at the original cost, rather than the acquisition cost, is the solution that is most fair to both customers and B&W.

The panel further finds that the 2008 tax return of Gasco Distribution Systems, Inc. and Subsidiaries provides the most sound support for the prior owner's original cost and the value of the pipeline at the time of acquisition. Therefore, the panel concludes that B&W's Plant in Service include $923,364 as the original cost of the pipeline, which includes the prior owner's original cost of plant of $854,826 and land of $68,538. Further, including $923,364 as the original cost of the pipeline, along with $437,715 of uncontested additions since B&W's acquisition, as well as uncontested land, structures and intangible property of $119,842, results in total Plant in Service of $1,480,921. Finally, the panel further adopts Accumulated Depreciation of $919,975 which includes accumulated depreciation of $854,826 related to the original pipeline acquired by B&W and $65,149 of accumulated depreciation related to the new additions.

(Footnotes omitted).

B&W argues that the rate base set by the Authority was unjust, due to the Authority's reliance upon "a document that was misinterpreted, which led the Authority to understate the value of the pipeline." B&W contends that the Authority abused its discretion by accepting the depreciated "tax value" of the pipeline rather than its "book" value. B&W further contends that the Authority's decision was not supported by substantial and material evidence. We disagree.

This Court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." *See In re All Assessments*, 1999 WL 632824, at *4 (quoting Tenn. Code Ann. § 4-5-322(h)(5)). Factual issues are reviewed upon a standard of substantial and material evidence, which this Court has defined as "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *See In re All Assessments*, 1999 WL 632824, at *4 (quoting *Sweet v. State Tech. Inst. at Memphis,* 617 S.W.2d 158, 161 (Tenn. App. 1981)) (in turn quoting *Pace v. Garbage Disposal Dist. of Washington Cty.*, 54 Tenn. App. 263, 390 S.W.2d 461, 463 (1965)). This Court will not

11

disturb a reasonable decision of an agency with "expertise, experience, and knowledge in the appropriate field." *See In re All Assessments*, 1999 WL 632824, at *4.

The Authority's decision to exclude the $2.6 million purchase price of the pipeline and wells from the rate base was supported by substantial and material evidence. Mr. Smith testified at length regarding his interpretation of the 2008 Gasco tax return, which was the only evidence presented regarding the prior owner's cost or valuation. Mr. Smith explained that the tax return showed $854,926.00 as plant/depreciable assets, which he opined could only refer to the pipeline because oil and gas wells constituted depletable rather than depreciable assets. Mr. Smith further explained that the amount of depreciation shown on the return, $22,564.00, was in accordance with a thirty-eight to forty-year depreciation schedule, which would be reasonable for a pipeline. Mr. Smith opined that the 2008 tax return was the most reliable information concerning the prior owner's assessment of value and that its reliability was further supported by its preparation by a certified public accountant and submission to the IRS. Based on this proof, we determine that the Authority's decision was based on evidence that is "both substantial and material in the light of the entire record." *See* Tenn. Code Ann. § 4-5-322(h).

Moreover, the Authority's determination to rely upon original cost information aligns with other rate base decisions. For example, in a factually similar case, the Authority held:

[T]he commission finds that the book value of the Franklin system at the time of the United Cities acquisition should be based on the original cost figures developed by Mr. Crenshaw and approved by the comptroller in 1973 rather than on the much higher estimate arrived at by the company's witness more than ten years later. The customers of the Franklin system have paid once for the system's assets; to accept the company's argument that the cost of those assets has now doubled would force ratepayers to pay once again for these same assets.

Company witness Fleming recognized the danger to ratepayers of permitting a gas utility to write up the value of its assets above their book value, and readily acknowledged that "as everyone is well aware, this commission generally allows the original costs of utility facilities in rate base." He noted that the reason why regulatory commissions insist on using original cost "is to keep people from double paying, in effect, artificially inflating the rate base" as the result of purchasing assets at a price higher than book value.

*See Re: United Cities Gas Co.*, No. U-84-7333, 1985 WL 1213311 (Tenn. P.S.C. June 10, 1985) (footnote omitted). *See also In Re: Petition of Chattanooga Gas Co. to Place into Effect A Revised Natural Gas Tariff*, No. 97-00982, 1998 WL 35628746 (Tenn. P.S.C. Oct. 7, 1998) (rejecting the utility's request to include acquisition costs in rate base upon determining that additional benefit to customers came from subsequent investments in plant system that were already incorporated into rate base).

As the Authority also noted in this action, B&W's acquisition cost included oil and gas wells. Testimony demonstrated that a significant portion of the income generated by B&W in the past came from oil and gas sales rather than pipeline operations. Testimony further demonstrated that rather than purchasing the pipeline and wells to maintain the status quo with regard to operations, B&W administrators hoped to utilize the pipeline for other uses in the future that may or may not involve providing utility service. For the foregoing reasons, we conclude that the Authority's determination regarding rate base should be affirmed.

IV.     Denial of Petition to Reconsider Pipeline Value

B&W alleges that the Authority abused its discretion by denying B&W's petition to reconsider the valuation of the pipeline and thus refusing to consider the new evidence presented by B&W with its petition. With regard to a petition for reconsideration, the Uniform Administrative Procedures Act states:

> (a) Any party, within fifteen (15) days after entry of an initial or final order, may file a petition for reconsideration, stating the specific grounds upon which relief is requested. However, the filing of the petition shall not be a prerequisite for seeking administrative or judicial review.
>
> * * *
>
> (d) An order granting the petition and setting the matter for further proceedings shall state the extent and scope of the proceedings, which shall be limited to argument upon the existing record, and <u>no new evidence shall be introduced unless the party proposing such evidence shows good cause for such party's failure to introduce the evidence in the original proceeding</u>.

Tenn. Code Ann. § 4-5-317 (2015) (emphasis added).

In its petition, B&W argued that the 2008 Gasco tax return had been misinterpreted by the Authority. B&W stated that it had located the former president of Gasco, Fred Steele, who had in turn located and provided the depreciation schedules and

other tax information for Titan Energy, a subsidiary of Gasco that owned the pipeline prior to B&W's purchase. Mr. Steele's unsworn affidavit and the additional tax information were attached to B&W's petition. B&W asserted that this additional tax information demonstrated that the pipeline had been depreciated at an accelerated rate for tax purposes over a period of seven years. According to B&W, this tax information also demonstrated that the sale of the pipeline was recorded in 2010 at a value of $1,212,892.80. Importantly, however, B&W's petition failed to contain any information concerning good cause for B&W's failure to present this evidence at the original hearing, as required by Tennessee Code Annotated § 4-5-317(d).

As the Authority points out, B&W had ample opportunity during the contested case hearing and for approximately sixty days thereafter to present any necessary evidence to meet its burden of proof, but B&W chose not to present additional evidence until after the Authority ruled. Because B&W failed to demonstrate good cause why this evidence could not have been presented earlier, we conclude that the Authority did not abuse its discretion by declining to consider the additional evidence. *See* Tenn. Code Ann. § 4-5-317(d). *See, e.g., Pavement Restorations Inc. v. Ralls*, No. W2016-01179-COA-R3-CV, 2017 WL 657775, at *8 (Tenn. Ct. App. Feb. 17, 2017) ("The refusal [by an administrative agency] . . . to grant a rehearing will not be found to be arbitrary or capricious unless the appellant can 'show specifically why [the appellant] was unable to procure the "newly discovered" evidence and that [the appellant] exercised due diligence in attempting to obtain the evidence prior to' the hearing.") (quoting *Bridges v. Culpepper*, No. 02A01-9704-CH-00074, 1997 WL 589242, at *4 (Tenn. Ct. App. Sept. 24, 1997)) (in turn quoting *Brown v. Weik*, 725 S.W.2d 938, 947 (Tenn. App. Oct. 3, 1983)). *See also* Tenn. Code Ann. § 65-2-116 (providing that a petition for rehearing before the Authority can be maintained where new evidence is discovered "which could not have been previously discovered by due diligence.").

V. Requirements of Tennessee Code Annotated § 4-5-314(c)

Finally, B&W argues that the Authority failed to make sufficient findings of fact and conclusions of law regarding its exclusion of B&W's related acquisition costs in the amount of $225,585.31 from the rate base. As B&W points out, the Uniform Administrative Procedures Act requires the following, in relevant part, with regard to a decision of the Authority:

(c) A final order, initial order or decision . . . shall include conclusions of law, the policy reasons therefor, and findings of fact for all aspects of the order, including the remedy prescribed . . . . Findings of fact, if set forth in language that is no more than mere repetition or paraphrase of the relevant provision of law, shall be accompanied by a concise and explicit statement

14

of the underlying facts of record to support the findings.  The final order . . . must also include a statement of the available procedures and time limits for seeking reconsideration or other administrative relief and the time limits for seeking judicial review of the final order.

Tenn. Code Ann. § 4-5-314 (2015).  Additionally, Tennessee's statutory scheme specifically applicable to proceedings before the Authority provides:

Every final decision or order rendered by the authority in a contested case shall be in writing, or stated in the record, and shall contain a statement of the findings of fact and conclusions of law upon which the decision of the authority is based.  Copies of such decisions or orders shall be delivered or mailed to each party or to the party's attorney of record.

Tenn. Code Ann. § 65-2-112 (2015).

In the case at bar, B&W alleges that the Authority failed to make specific findings of fact regarding the related acquisition costs.  We disagree.  The Authority specifically held in its order upon reconsideration:

B&W included the acquisition costs of $225,585.31 as part of the purchase price of $2.6 million as part of [B&W's] proposed rate base.  The Authority previously set rates in a decision which rejected the purchase price of the system put forth by [B&W] and included the acquisition costs of $225,585.31 at issue upon reconsideration.  By rejecting [B&W's] proposal to establish rates based on the purchase price, the Authority also tacitly rejected the acquisition costs related to the purchase.  After reviewing and reconsidering the record, the panel found that the Authority made its decision based on the best evidence it had before it and voted unanimously to affirm its decision.

As this Court has previously explained:

An agency, when issuing a final order, must provide a concise and explicit statement of the underlying facts supporting the agency's findings. Tenn. Code Ann. § 4-5-314(c).  Findings of fact made by the agency should be based exclusively on the evidence of the record and on matters noted in the proceeding.  Tenn. Code Ann. § 4-5-314(d).  Exactness in form and procedure is not required; rather, the findings based on the evidence need only be specific and definite enough so that a reviewing court may determine the pertinent questions of law and whether the agency's general

15

<u>findings should stand</u>, particularly when the findings are material facts at issue. *See Levy v. State of Tennessee Bd. Of Exam'rs for Speech Pathology and Audiology,* 553 S.W.2d 909, 911-12 (Tenn. 1977) (quoting *State Bd. of Med. Exam'rs v. Grandy,* 149 S.E.2d 644, 646 (S.C. 1966)). "The sufficiency of an agency's findings of fact must be measured against the nature of the controversy and the intensity of the factual dispute." *CF Industries v. Tennessee Pub. Serv. Comm'n,* 599 S.W.2d 536, 541 (Tenn. 1980).

*Consumer Advocate Div. ex rel. Tenn. Consumers*, 2001 WL 575570, at *4 (emphasis added).

In this matter, the Authority clarified that its rejection of the related costs stemmed from its decision to exclude the overall acquisition costs of $2.6 million, and the reasons for such exclusion were explained in great detail in the Authority's earlier order setting rates, as set forth above. We conclude that the Authority made sufficient factual findings to facilitate this Court's review. We therefore determine this issue to be without merit.

## VI. Conclusion

For the foregoing reasons, we affirm the Authority's decision in all respects. Costs on appeal are taxed to the appellant, B&W Pipeline, LLC. This case is remanded to the Authority for enforcement of the judgment below.

_____
THOMAS R. FRIERSON, II, JUDGE

16